In the Matter of the Estate of JOSEPH AUDITORE, Deceased.

Surrogate's Court, Kings County, March 1, 1930.

*John J. Kean* [*Edward H. Wilson* of counsel], for the petitioner.

*Edward H. Wilson,* for the Mechanics Bank.

*Olvany, Eisner & Donnelly,* for the National Surety Company, respondent.

*Thomas Cradock Hughes,* special guardian.

WINGATE, S. This proceeding first came on for hearing in this court on November 24, 1925, and the taking of testimony on the first trial was concluded on March 16, 1927, resulting in a decree, entered on May 18, 1927, surcharging Frank Auditore, as administrator of Joseph Auditore, deceased, with the net sum of $203,348.75. Upon appeal, this determination was modified (*Matter of Auditore,* 223 App. Div. 654), the *rationes decidendi* of the Appellate Division being, in turn, modified by the Court of Appeals (*Matter of Auditore,* 249 N. Y. 335), and the entire matter remitted to this court for further proceedings in accordance with the opinion then rendered.

At the time of the death of Joseph Auditore on May 9, 1920, he and his brother Frank, the present respondent, were associated together in the business of stevedoring and shipping. No doubt, partially as a result of ocean transport activity during and immediately following the war, this enterprise had grown to very considerable proportions. The affairs of the brothers appear formerly to have been conducted as a copartnership, but at the time of Joseph's death the parent business, if it may be so termed, was incorporated under the name of Auditore Contracting Company, capitalized at $100,000, one-half of the stock being owned by each brother.

In addition to this parent concern, the brothers had acquired four ships, the *Susquehanna,* the *Redondo,* the *Lydia* and the *Sacramento,* each of which was owned by a separate subsidiary corporation; and they had further incorporated a concern known as the Auditore Steamship Line which acted largely as a fiscal agent for the steamship corporations.

The executors under Joseph's will renounced, and on August 18, 1920, letters of administration c. t. a. were issued to decedent's widow and his brother Frank, and a bond for $500,000 with the National Surety Company as surety was duly filed.

From May, 1920, until November, 1923, Frank Auditore was president, treasurer and one of the three directors of the contracting company, and Joseph G. Stockham, who was completely under his control, was secretary and a second director. During this entire period Frank Auditore was the holder of all of the capital stock of the company, one-half in his own right, and the balance as administrator of his brother's estate.

Beginning promptly after Joseph's death and continuing until toward the close of 1923, Frank inaugurated a systematic looting of the business. His defalcations, which aggregated the formidable total of $312,074.51, were divided by periods, as follows: April 1 to July 1, 1920, $12,063.94; July 1 to October 1, 1920, $42,884.93; October 1 to December 31, 1920, $28,692.40; January 1 to April 1,

1921, $19,372.27; April 1 to July 1, 1921, $17,279.21; July 1 to October 1, 1921, $12,090.98; October 1 to December 31, 1921, $14,767.47; January 1 to April 1, 1922, $21,746.69; April 1 to July 1, 1922, $76,932.21; July 1 to October 1, 1922, $18,548.94; October 1 to December 31, 1922, $13,713.80; January 1 to April 1, 1923, $29,603.55; April 1 to July 1, 1923, $520; July 1 to October 1, 1923, $2,403.70; October 1 to December 31, 1923, $1,454.32.

A representative action was brought against him in the Supreme Court to recover these misappropriations, and judgment was recovered in the name of the corporation, but nothing was ever realized thereon.

This accounting proceeding was thereupon instituted and a recovery was granted by this court on the theory that the defalcations amounted to informal dividends received by Frank, for one-half of which he was accountable to the estate. A substantially similar result was attained by the Appellate Division on the basis of a disregard of the corporate entity. The determination of the Court of Appeals sustains the general principle of liability of Frank Auditore and of his surety and defines this obligation as being two-fold, namely:

*First*, as to the misappropriations prior to his qualification as administrator, aggregating $39,298.01; and

*Second*, as to such defalcations during the period of his incumbency of the office of administrator, aggregating $272,776.40.

The first potential liability is based on negligence; the second, on damage by affirmative act to the stock owned by the estate.

Respecting the former cause of action, the court says (at p. 345): " The administrator and his bondsman would be liable for any neglect in gathering in the assets of the estate. If the administrator himself owed money to the estate it would be his duty to pay it. If he could have paid the amount of his indebtedness, but delayed doing so until he was insolvent, the bondsman might be liable for this loss, dependent upon the circumstances."

Again (at p. 346): " If * * * he become insolvent within the time that an ordinarily prudent administrator would have acted under like circumstances, then he as administrator would not be liable to the estate for failure to pay back the money to the corporation or for failure to commence the appropriate proceedings to collect it. In other words, as to acts happening before Frank Auditore was appointed administrator, whether these be his own acts or the acts of third parties, he and his bondsman are only liable for negligence, the failure to pursue that diligence which reasonably prudent and careful men would use."

In other words, the elements for recovery on the first ground

are " solvency and ability to collect " within such period as a reasonably diligent and prudent administrator, who had the same knowledge as that possessed by Frank Auditore, would have acted.

Reviewing the facts disclosed and deducible from the record on this branch of the case, we find that at the time of the appointment of the administrator on August 18, 1920, he was fully acquainted with the fact of the defalcations. He also knew that the debtor had no intention of making restitution unless forced to do so. The sum involved was sizeable. He was fully aware of the financial situation of the debtor, which will presently be reviewed. Under such circumstances, not more than a week at most would, in the opinion of the court, have elapsed before a " reasonably prudent and careful " man would have seen to it that an action was instituted to recover the money. This would place the date of the service of summons and complaint on August 25, 1920. Twenty days later, or on September 14, 1920, the time to answer would have expired. There is certainly no presumption of law that a defendant in any action will interpose a perjured answer. It, therefore, follows that on September fifteenth, or sixteenth at the latest, a judgment would have been entered.

The next question, as to the collectibility of such a judgment, must, on the facts disclosed, be answered in the affirmative. On the date of entry of the hypothetical judgment the supposititious judgment debtor had a credit balance in the People's Trust Company of Brooklyn of $23,193.41 and was the owner of $80,000 of Liberty Bonds.

This showing demonstrates, at least *prima facie*, the collectibility of this hypothetical judgment and of the solvency of the judgment debtor, imposing upon respondents at least the burden of proceeding with proof in rebuttal.

The only proof of this nature which was adduced was, *first*, a long series of unsatisfied judgments against Frank Auditore, the first of which, with the exception of two in March and April, 1923, aggregating $233.70, was entered on September 6, 1923, almost three years subsequent to the date of the hypothetical judgment; and *second*, a number of alleged Federal tax liens for years from 1917, which on their faces were not entered of record until April 3, 1929, and which were discharged the following November.

Neither of these showings had any bearing whatsoever on the question at issue, which was as to the collectibility of a judgment against Frank Auditore and his solvency on or about September 15, 1920, and the court finds and determines that the petitioner has established her right to recover on the cause of action for

negligence as defined by the Court of Appeals. (*Gaylord* v. *Anderson*, 126 Misc. 283, 285, 286.)

Turning now to the second basis for recovery as defined by the Court of Appeals, we find the following directions in its opinion on this branch of the case:

At page 341: " By wrongfully taking all the assets of the corporation and applying them to his own use, he violated this trust and destroyed or lowered the value of this stock or the assets of the estate. For the damage done he and his surety should be held liable. The damage is the reduced value of the stock due to Frank's misappropriations while administrator."

Again (at p. 342): " The trustee is liable for the loss in value which he has occasioned. Of course, if the liabilities of the corporation exceeded its assets, there could be no damage done. The value depends upon the financial condition of the corporation as of the time of Frank's appointment as administrator and his misappropriations."

At page 344: " We are of the opinion * * * that the surrogate should ascertain the value of the stock and its depreciation due to the illegal acts of the administrator, *i. e.*, the damage done to the value of the stock. This may require the examination of many items of assets and liabilities. The value of the stock is to be determined as in any other case. The Surrogate is not dealing with the corporation but with the value of its stock at specified times."

At page 347: " * * * the administrator and his bondsman are liable for the misappropriations irrespective of the solvency of the administrator."

On the strict letter of the wording of the foregoing excerpts from the opinion of the Court of Appeals, it might be arguable that the rule enunciated required that balance sheets of the company should be struck immediately prior and subsequent to each misappropriation by Frank Auditore. Since the period involved covers almost three and a half years, and for a considerable period of such time the defalcations appear to have occurred at least once a week and sometimes oftener, the substantially impossible magnitude of such a task will be realized, involving, as it well might, approximately three hundred and fifty balance sheets, each composed of dozens or even scores of figures. When, however, it is recalled that the condition of the Auditore Contracting Company on any given day further depended in considerable measure upon the conditions of the Susquehanna Steamship Company, the Redondo Steamship Company, the Lydia Steamship Company, the Sacramento Steamship Company and the Auditore Steamship Line,

it will be seen that the number of necessary balance sheets would increase to over two thousand, each made up of many figures. The cost involved in such an examination of the affairs of large and active corporations similar to those here concerned might well appreciably exceed the total involved in this proceeding, large though it be.

Faced by this practical difficulty, the parties tacitly agreed that the solution of the questions should be sought from the balance sheets of the contracting company of May, August and December, 1920, and December, 1921, 1922 and 1923, and of the other five corporations on each of the four December dates, with either party, of course, privileged to present any additional figures which he might deem to his advantage. Even when treated on this limited basis, the number of different figures and components of figures passed upon totalled many thousands.

The balance sheet of the Auditore Contracting Company of August 31, 1920, which date was adopted as the nearest practicable one to the date of appointment of Frank Auditore as administrator, indicated complete solvency of the company, unimpaired capital and a surplus. This balance sheet was not attacked by the respondent or his surety and it may, therefore, be taken as established that at the time Frank Auditore assumed his duties as administrator the company was not only solvent but that its stock was worth in excess of its face value.

All subsequent balance sheets were made the subject of violent attack and equally spirited defense. The respondent and his surety on the one hand sought to tear down assets and increase liabilities, while the efforts of the petitioner and the special guardian were largely the reverse.

It would manifestly be impossible for the court in any decision of reasonable length to review separately each of the hundreds of items thus brought into question, nor is such a course necessary, since the general principles upon which the court reaches its conclusions are of repeated application.

These general principles applicable to the case at bar will, therefore, be stated.

1. The entries in the books of the companies made in the usual course of business are *prima facie* proof of the correctness of the assets and liabilities set forth. (Civ. Prac. Act, § 374-a; *Meeker* v. *Claghorn*, 44 N. Y. 349, 352; *Foster* v. *Persch*, 68 id. 400, 402; *Meister* v. *Sharkey's Monument Works*, 5 App. Div. 470, 472; *Konwiser* v. *Retail Tobacconist Printing & Publishing Co.*, 157 N. Y. Supp. 829, 830.)

2. These entries were subject to impeachment by either party

but the burden of showing the impropriety of any asset or liability item was on the person seeking to establish a change therein. (Cases above cited, and *Franklin Coal Co.* v. *Hicks*, 46 App. Div. 441, 444; *Mollineaux* v. *Clapp*, 99 id. 543, 544; *Lauck* v. *Rohde*, 20 Misc. 346, 348; *Brown* v. *Recknagel*, 4 N. Y. Supp. 101, 102.)

3. The burden of demonstrating that an entirely new asset or liability item should be added to those contained in the books rested upon the party asserting the fact. (Cases above cited.)

4. If it is demonstrated by a fair preponderance of the evidence that a certain liability item set upon the books was subsequently determined not to be a liability, such item will be eliminated in all places where it appears.

5. The mere fact that a liability item was at some later time written off the books to surplus or that it was not enforced by the obligee is not sufficient demonstration that it did not represent an actual liability at the time it was entered on the books.

6. Evidence that an asset or liability item was due from or to a " subsidiary " of the concern on the books of which such item is carried, does not of itself warrant the elimination of such item.

7. If it be shown that any asset item was ultimately paid in full by cash or credit, such showing demonstrates *prima facie* that such asset was valid from its inception to the extent of such ultimate payment, even though the payor at the time such payment was made was not in a financial condition to make payment to all its other creditors on the same basis.

8. If it be shown that an item entered as an asset was ultimately collected by suit, the validity of such item at its full value as so collected is established, the expenses of suit being chargeable to the general expense of the conduct of the business at the time they were incurred.

9. A showing that an asset item was never collected does not of itself demonstrate that such item was not a valid asset at the time it was entered on the books.

10. Where tangible assets acquired at an earlier period are carried on the books at their original cost, an offsetting entry for depreciation may not be eliminated in the absence of a showing that such assets were then worth their full original cost.

11. Where it appears that any particular asset item was not ultimately paid in full and the assets and liabilities of the obligor are shown, the value of such asset item at that time will be determined to be that proportion thereof which the total assets of the obligor bear to its total liabilities as computed from such showing of the assets and liabilities of the said obligor.

12. So long as it appears that the assets of the Auditore Con-

tracting Company equaled the liabilities, exclusive of capital stock, all misappropriations by Frank Auditore were an injury to the stock owned by the estate to the extent of one-half of the total of the such misappropriations.

13. Solvency, for the purpose of this determination, is assumed to be that the assets of the corporation equal the liabilities, exclusive of capital stock.

14. It having been shown that the Auditore Contracting Company was solvent on a certain date, that condition will be presumed to continue until its insolvent status has been affirmatively demonstrated. (*Di Ionna* v. *Terry & Tench Co.*, 203 App. Div. 270, 271; *Feigenbaum* v. *Hizsnay*, 187 id. 126, 130; *Gallagher* v. *Perot*, 122 Misc. 845, 847; *O'Conner* v. *Gifford*, 117 N. Y. 275, 279.)

Before applying the foregoing principles to the facts and figures of the case, certain specific questions partially involving some of these points will be briefly noted.

The first concerns the marine bonds issued to the Auditore Steamship Line against the steamship *Susquehanna*. It appears from the record that these bonds were issued in an attempt to establish a prior lien on the vessel, which had become involved in difficulties as a result of stranding. No value was ever given for them by the obligee to which they were delivered, and in the Supreme Court action they were determined to be merely a paper transaction without any actual basis of liability. On this showing the court is satisfied that they should be entirely eliminated, both as an asset and as a liability. The ultimate effect of the adoption of this course is slight, so far as the Auditore Contracting Company is concerned, since the bonds, in so far as issued, were at all times owned by the Auditore Steamship Line, Inc.

The next question concerns the validity as obligations bearing upon the solvency of the various companies of a number of alleged Federal and State tax liens for the years from 1917 forward.

These alleged liens against the Auditore Contracting Company aggregate the sum of $517,432.34 and purported to have been assessed on April 3, 6 and 8, 1929. They were canceled of record on November 1, 1929. The court is entirely aware of the fact that a tax assessment is not the subject of collateral attack, but the effect to be given to such assessments as these on the particular questions here presented for determination is, in its opinion, an entirely different matter. It is a cogent circumstance in this connection that the levying of these assessments was coincident with the virtual custody of the books of these corporations by the respondents. There is no testimony in the record to the fact, but the inference is irresistible that respondents, having access to

the books, sought to achieve a master stroke by inducing the levying of tax assessments which would make the corporations appear insolvent during the entire period under review and thus preclude the possibility of surcharge under the opinion of the Court of Appeals. That the assessments were not valid obligations of the companies is indicated by their prompt cancellation of record. The point attempted to ˙ be made by counsel for respondents that the certificates of discharge state that the taxes were " paid " is without merit. To give it weight would produce the fantastic effect that in order to remove one obstacle to the recovery of somewhat over $200,000, petitioners had paid over half a million.

In the opinion of the court, this tax question is to be disposed of on the basis of principle No. 3, *supra*. Respondents have failed to demonstrate that these alleged claims were actual, valid and subsisting obligations of any of the companies during any portion of the period here in question.

· Counsel for petitioner urges in his brief that various sums should be added to the assets of the Auditore Contracting Company by way of good will. In the opinion of the court, principle No. 3 is also applicable here. It requires no evidence to demonstrate that the sort of business here involved expanded in a mushroom growth during and immediately succeeding the war. This is a matter of common knowledge possessed by any reasonably informed member of the community. A showing of earnings during this period is no criterion by which to judge the normal earnings of the business; and upon such a showing alone can a determination of the value of good will be based. Any asset value of good will is, therefore, disallowed for failure of adequate proof thereof.

Coming now to the concrete application of the principles above noted to the figures of assets and liabilities of the various companies during the period, the court finds as follows:

On December 31, 1920, the standing of the Redondo Steamship Company was:

| | |
|---|---|
| Assets, including steamer..................... | $1,089,684 22 |
| Liabilities, exclusive of capital stock but including mortgage on steamer.................. | 925,368 79 |
| Leaving clear assets of................. | $164,315 43 |

There was outstanding capital stock to a total of $500,000. As a result, on this date this company was solvent and its stock was worth thirty-two and eighty-six one-hundredths cents on the dollar.

On December 31, 1921, the standing of the Lydia Steamship Company was:

| | | |
|---|---:|---:|
| Total assets | 1,040,516 | 56 |
| Less value of ship | 553,828 | 86 |
| Net general assets | $486,687 | 70 |

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $1,385,847 | 80 |
| Less value of ship mortgaged | 553,828 | 86 |
| General liabilities | $832,018 | 94 |

As a result, the $255,000 capital stock outstanding had no value and the ability of the company to pay creditors amounted to fifty-eight and forty-nine one-hundredths cents on the dollar.

On December 31, 1920, the standing of the Sacramento Steamship Company was:

| | | |
|---|---:|---:|
| Assets | $30,234 | 84 |
| Liabilities, exclusive of capital stock | 30,087 | 51 |
| Excess of assets over liabilities | $147 | 33 |

As a result, the company was able to pay creditors in full, and its $500,000 par value of capital stock was worth two one-hundredths of one cent on the dollar.

On December 31, 1920, the standing of the Susquehanna Steamship Company was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $1,510,237 | 78 |
| Assets | 940,562 | 37 |
| Excess of liabilities over assets | $569,675 | 41 |

As a result, the $500,000 capital stock outstanding had no value and the ability of the company to pay creditors amounted to sixty-two one-hundredths cents on the dollar.

On December 31, 1920, the standing of the Auditore Steamship Line was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $781,049 | 23 |
| Assets | 341,476 | 04 |
| Excess of liabilities over assets | $439,573 | 19 |

As a result, the $10,000 capital stock outstanding had no value and the ability of the company to pay creditors amounted to forty-three and seventy-two one-hundredths cents on the dollar.

On December 31, 1920, the standing of Auditore Contracting Co., Inc., was:

| | | |
|---|---:|---:|
| Assets (including all misappropriations to date by Frank Auditore) | $454,129 | 19 |
| Less such misappropriations | 83,641 | 27 |
| Net assets | $370,487 | 92 |
| Liabilities, excluding capital stock | 73,600 | 87 |
| Clear assets | $296,887 | 05 |
| Less capital stock | 100,000 | 00 |
| Surplus | $196,887 | 05 |

As a result, the company was able to pay creditors in full, and its stock, without taking Frank Auditore's embezzlements into account, was worth $296.89 per share. Obviously, therefore, the misappropriations of Frank Auditore prior to December 31, 1920, were made wholly at the expense of the stock and he and his surety are liable therefor.

On December 31, 1921, the standing of the Redondo Steamship Company was:

| | | |
|---|---:|---:|
| Assets | $505,412 | 48 |
| Less value of steamer | 419,013 | 62 |
| Net general assets | $86,398 | 86 |
| Liabilities, exclusive of capital stock | $1,040,193 | 54 |
| Less value of steamer mortgaged | 419,013 | 62 |
| Net general liabilities | $621,179 | 92 |

As a result, the capital stock had no value and the ability of the company to pay creditors amounted to thirteen and nine-tenths cents on the dollar.

On December 31, 1921, the standing of the Lydia Steamship Company was:

| | | |
|---|---:|---:|
| Assets | $387,153 | 50 |
| Less value of steamer | 336,932 | 26 |
| Net general assets | $50,221 | 24 |
| Liabilities, exclusive of capital stock | $959,934 | 60 |
| Less value of steamer mortgaged | 336,932 | 26 |
| Net general liabilities | $623,002 | 34 |

As a result, the capital stock had no value and the ability of the company to pay creditors amounted to eight and six one-hundredths cents on the dollar.

On December 31, 1921, the standing of the Susquehanna Steamship Company was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $1,128,354 | 73 |
| Assets | 453,749 | 87 |
| Actual deficit | $674,604 | 86 |

As a result, the capital stock had no value and the ability of the company to pay creditors amounted to forty and twenty-one one-hundredths cents on the dollar.

On December 31, 1921, the standing of the Auditore Steamship Line was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $543,517 | 48 |
| Assets | 184,651 | 16 |
| Actual deficit | $358,866 | 32 |

As a result, the capital stock had no value and the ability of the company to pay creditors amounted to thirty-three and thirty-five one-hundredths cents on the dollar.

On December 31, 1921, the standing of the Sacramento Steamship Company was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock | $30,087 | 51 |
| Assets | 22,538 | 65 |
| Actual deficit | $7,548 | 86 |

As a result, the capital stock had no value and the ability of the company to pay creditors amounted to seventy-four and nine-tenths cents on the dollar.

On December 31, 1921, the standing of Auditore Contracting Company was:

| | | |
|---|---:|---:|
| Assets (including all misappropriations to date by Frank Auditore) | $403,768 | 52 |
| Less such misappropriations | 147,151 | 20 |
| Net actual assets | $256,617 | 32 |
| Liabilities, excluding capital stock | 48,612 | 57 |
| Clear assets | $208,004 | 75 |
| Less capital stock | 100,000 | 00 |
| Surplus | $108,004 | 75 |

As a result, the company was able to pay creditors in full, and its stock, without taking Frank Auditore's embezzlements into account, was worth $208 per share. Obviously, therefore, the misappropriations of Frank Auditore during the year 1921 were made wholly at the expense of the stock and he and his surety are liable therefor.

On December 31, 1922, the standing of the Redondo Steamship Company was:

| | |
|---|---|
| Assets, including steamer...................... | $268,918 52 |
| Liabilities, exclusive of capital stock............. | 122,179 55 |
| Leaving clear assets of.................... | $146,738 97 |

As a result, on this date this company was solvent and its stock was worth twenty-nine and thirty-four one-hundredths cents on the dollar.

On December 31, 1922, the standing of the Lydia Steamship Company was:

| | |
|---|---|
| Assets...................................... | $118,250 51 |
| Liabilities, exclusive of capital stock............. | 105,882 36 |
| Leaving clear assets of.................... | $12,368 15 |

As a result, on this date this company was solvent and its stock was worth four and eighty-five one-hundredths cents on the dollar.

On December 31, 1922, the standing of the Sacramento Steamship Company was:

| | |
|---|---|
| Liabilities, exclusive of capital stock............. | $38,738 79 |
| Assets...................................... | 3,161 53 |
| Deficit................................ | $35,577 26 |

As a result, on this date the stock had no value and the ability of the company to pay creditors amounted to eight and one-tenth cents on the dollar.

On December 31, 1922, the standing of the Susquehanna Steamship Company was:

| | |
|---|---|
| Liabilities, exclusive of capital stock............. | $755,839 66 |
| Assets...................................... | 39,169 08 |
| Deficit................................ | $716,670 58 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to five and eighteen one-hundredths cents on the dollar.

On December 31, 1922, the standing of the Auditore Steamship Line was:

| | |
|---|---:|
| Liabilities, exclusive of capital stock............... | $492,649 10 |
| Assets..................................... | 120,797 50 |
| Deficit................................. | $371,851 60 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to twenty-four and ninety-two one-hundredths cents on the dollar.

On December 31, 1922, the standing of the Auditore Contracting Company was:

| | |
|---|---:|
| Assets (including misappropriations to date by Frank Auditore)........................... | $432,513 53 |
| Less such misappropriations.... ............... | 278,092 94 |
| Net actual assets........................ | $154,420 59 |
| Liabilities, exclusive of capital stock............. | 66,812 61 |
| Net assets over liabilities................. | $87,607 98 |

As a result, the company was able to pay creditors in full, and its stock, without taking Frank Auditore's embezzlements into account, was worth eighty-seven dollars and sixty-one cents per share. Obviously, therefore, the misappropriations of Frank Auditore during the year 1922 were made wholly at the expense of the stock and he and his surety are liable therefor.

On December 31, 1923, the standing of the Redondo Steamship Company was:

| | |
|---|---:|
| Assets..................................... | $107,068 86 |
| Liabilities, exclusive of capital stock.............. | 3,151 41 |
| Clear assets.............................. | $103,917 45 |

As a result, on this date the company was able to pay creditors in full and its stock was worth twenty and seventy-eight one-hundredths cents on the dollar.

On December 31, 1923, the standing of the Lydia Steamship Company was:

| | |
|---|---:|
| Liabilities, exclusive of capital stock............. | $130,192 72 |
| Assets..................................... | 112,728 50 |
| Deficit................................. | $17,464 22 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to eighty-six and fifty-eight one-hundredths cents on the dollar.

On December 31, 1923, the standing of the Sacramento Steamship Company was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock............ | $7,833 | 54 |
| Assets..................................... | 202 | 35 |
| Deficit................................... | $7,631 | 19 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to two and fifty-eight one-hundredths cents on the dollar.

On December 31, 1923, the standing of the Susquehanna Steamship Company was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock............ | $736,021 | 64 |
| Assets..................................... | 10,518 | 34 |
| Deficit................................... | $725,503 | 30 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to one and forty-two one-hundredths cents on the dollar.

On December 31, 1923, the standing of the Auditore Steamship Line was:

| | | |
|---|---:|---:|
| Liabilities, exclusive of capital stock............ | $415,037 | 90 |
| Assets..................................... | 6,538 | 99 |
| Deficit................................... | $408,498 | 91 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to one and fifty-seven one-hundredths cents on the dollar.

On December 31, 1923, the standing of the Auditore Contracting Company was:

| | | |
|---|---:|---:|
| Assets (including all misappropriations to date by Frank Auditore)............................. | $311,453 | 07 |
| Less such misappropriations.................... | 303,492 | 94 |
| Clear assets................................ | $7,960 | 13 |
| Liabilities, exclusive of capital stock............ | 24,587 | 42 |
| Deficit................................... | $16,627 | 29 |

As a result, on this date its stock had no value and its ability to pay creditors amounted to thirty-two and thirty-seven one-hundredths cents on the dollar.

It is obvious on these figures that had any misappropriations been made by Frank Auditore subsequent to December 31, 1923, they would not be recoverable in this proceeding, since on and subsequent to that date the stock had no value and any embezzlements would have been of funds beneficially belonging to creditors. But the only recovery here sought is for embezzlements prior to that date. The last prior date on which the financial condition of the company appears was on December 31, 1922, when it was proved to be solvent and showing an equity in the stock of eighty-seven dollars and sixty-one cents per share. Under principle No. 14, *supra*, this condition of solvency is presumed to continue until a contrary condition is shown to have come into being. As this was a condition to be demonstrated by respondents in order to terminate their further liability, and they have failed to sustain the burden in this direction, they must be held liable for all misappropriations up to December 31, 1923.

Under the circumstances, it is unnecessary to consider the question of the propriety of including any of Frank Auditore's misappropriations in the balance sheets of the contracting company, which procedure was claimed by the petitioner and conceded except as to the embezzlements prior to August 18, 1920, in the briefs of the respondents.

From the proof adduced, it is apparent that all of the embezzlements of Frank Auditore from the Auditore Contracting Company subsequent to his qualification as administrator, were from funds of the company in excess of all sums necessary to satisfy the claims of its creditors. It necessarily follows, therefore, that every dollar so taken depreciated the value of the stock of the company. Since one-half of the stock was the property of this estate, it follows that this asset of the estate was damaged to the extent of exactly one-half of the sums misappropriated.

There remains for consideration the embezzlements during the period under review from the Auditore Company of New York and the Auditore Company of Delaware, which were all made in 1923 and aggregated $8,581.57.

The only direct proof adduced upon the hearings respecting the affairs of these companies was their balance sheets on December 31, 1923. These showed for the Auditore Company of New York:

| | | |
|---|---:|---:|
| Total assets..................................... | $70,472 | 07 |
| Liabilities, exclusive of capital stock.............. | 47,831 | 20 |
| | | |
| Clear assets................................ | $22,640 | 87 |
| Less capital stock............................. | 1,000 | 00 |
| | | |
| Surplus..................................... | $21,640 | 87 |
| For the Auditore Company of Delaware: | | |
| Total assets..................................... | $80,256 | 18 |
| Liabilities, exclusive of capital stock............. | 50,781 | 85 |
| | | |
| Clear assets................................ | $29,474 | 33 |
| Less capital stock.............................. | 1,000 | 00 |
| | | |
| Surplus..................................... | $28,474 | 33 |

While it is undoubtedly true that presumptions of status do not ordinarily run backwards, yet it appears from the record on the former trial that the Auditore Company of Delaware was organized in or about November, 1922, and that the Auditore Company of New York was incorporated about October, 1923. Unquestionably, a presumption exists that a corporation is solvent at the time of its organization.

Since, therefore, this initial presumption is followed by a showing — thirteen months later in the one case and two months later in the other — of surpluses equaling, respectively, over twenty-one and twenty-eight times the total capital, it would seem to be a legitimate deduction from the facts that such corporations were at all times solvent during the intervals, especially since no attempt was made by respondents to demonstrate a different situation.

Such being the case, it follows that the defalcations from these companies were direct injuries to their capital stocks to the total extent of such misappropriations. Since the estate was, under the Supreme Court decision, the owner of one-half of the stock of each of these companies, it must follow that Frank Auditore and his surety are bound to make restitution for the embezzlements from these companies for identical reasons compelling them to make compensation for the injury to the stock of the Auditore Contracting Company.

The court, therefore, finds and determines that the petitioner is entitled to recover the following sums from the respondents:

$19,649.01 with interest from August 18, 1920
7,825.43 with interest from October 1, 1920
14,346.20 with interest from December 31, 1920
9,686.14 with interest from April 1, 1921
8,639.60 with interest from July 1, 1921
6,045.49 with interest from October 1, 1921
7,383.73 with interest from December 31, 1921
10,873.35 with interest from April 1, 1922
38,466.10 with interest from July 1, 1922
9,274.47 with interest from October 1, 1922
6,856.90 with interest from December 31, 1922
14,801.77 with interest from April 1, 1923
260.00 with interest from July 1, 1923
1,201.85 with interest from October 1, 1923
727.16 with interest from December 31, 1923

Against said sums there are to be allowed as offsets premiums due the National Surety Company as follows:

$1,750 with interest from August 17, 1920
1,750 with interest from August 17, 1921

All items of interest are to be computed from the respective dates, *supra*, to the date of the entry of the decree herein.

Enter decree on notice accordingly.