Matthew M. Levy, J.
In the state of the pleadings remaining after motions at Special Term, this is an action at law to recover damages for breach of contract. The case was tried before the court without a jury. Many days were occupied in the presentation of the conflicting evidence. Numerous exhibits were offered and many were received. After the close of the trial, there were submitted to me for individual disposition 194 separately numbered proposed findings of fact and conclusions of law — many including in essence, although unnumbered, subdivisions of factual facets and legal logistics. A number of briefs on the facts and on the law were filed to aid me in arriving at a determination. I think it appropriate to say that I have carefully considered all of the proof (verbal and documentary) and all of the arguments (oral and written). I have passed upon all of the proposed findings and conclusions. In the circumstances, I *80 shall refrain at this point from doing more than expressing my views on some of the principal issues of fact and law presented.
The basis of the action is a letter dated January 28, 1948, addressed to the defendant Friedeberg, signed by the plaintiff, and subscribed by Friedeberg to the effect that it “ correctly states our agreement ”. It reads as follows:
“ You have exhibited to me a certain scrap purchase agreement between yourself, as seller, and Carnegie-Illinois Steel Corporation, a New Jersey Corporation, of 434 Fifth Avenue, Pittsburgh 30, Pennsylvania, a subsidiary of the United States Steel Corporation, as buyer, which agreement is dated January 19th, 1948.
“ This letter is to confirm our agreement in respect thereto, as follows:
“ 1. You are to organize a corporation for the purpose of performing said agreement on the part of the seller, and you are to assign said agreement, and any other business you do on this, or other European trips to such corporation.
“ 2. You are to loan to the corporation the sum of $5,000.00 upon such terms as to interest and date of repayment as you may decide.
“ 3. I will loan the corporation the sum of $5,000.00, upon the same terms and conditions as your loan as to date of repayment. The interest on my loan shall be the same as yours, plus 10% of the profits of said corporation on said agreement of January 19 th, 1948.
“ 4. If said corporation requires any further financing, permanent or temporary, I am to have the option of arranging the same. Such option is to be exercised by me within ten (10) business days after receipt by me of such documents as may reasonably be required to determine whether the financing can be arranged. If I exercise such option, and arrange for such financing, I am to receive 33%rd% of the profits of the corporation, inclusive of the 10% mentioned in paragraph ‘ 3 ’ of this letter. Said 33%rd% shall include all interest, bonus and expenses, and all other financing charges of every kind and description, in connection with said agreement of January 19th, 1948, as well as compensation for my services performed in arranging for such additional financing.
“5. In computing said profits, only ordinary and necessary expenses are to be taken into account, and there is not to be deducted any salary or compensation for your time or services, or any executive salaries or compensation not agreed upon by me.
*81 “ 6. I herewith acknowledge that I know there is a prohibition against publicity in the Carnegie-Illinois Steel Corporation contract and herewith agree to be bound by same and make no disclosures concerning same as therein prohibited.
“ 7. It is understood that I shall share in the profits of any other business which is the outcome of this or other European trips in the same percentages and terms as above mentioned in paragraphs ‘ 3 ’ and ‘ 4 ”
The crux of the action is that Friedeberg, either directly or through the defendant Scrap Iron and Steel Import Corporation (the company organized by Friedeberg in pursuance of the aforesaid agreement between him and the plaintiff), made large profits and that the plaintiff was not paid his share thereof as provided in the agreement.
The initial issue to be resolved is the expiration date of the contract sued upon. It is quite plain that the document (above set forth in full) does not in express terms specify a time limitation. The Carnegie contract with Friedeberg, referred to in the Friedeberg agreement with the plaintiff, was cancelled by Carnegie on June 1, 1949, due to unsafe and prohibited materials imbedded in the scrap delivered by the defendant Scrap Iron to Carnegie, to wit: bombs, firing breaches, guns, sealed containers, shrapnel and gunpowder — causing explosions while the scrap was in transportation and at the mills. On the one hand, the defendants vigorously contend that the cancellation of the Carnegie agreement ipso facto terminated the plaintiff ’s agreement. I do not agree. On the other hand, the plaintiff asserts that the agreement between the parties created a joint venture in which he had a participating interest and that, by virtue of the contract, the defendants had assumed a fiduciary responsibility vis-a-vis the plaintiff which would affect the matter of termination (and other issues in dispute). I do not so consider the obligations of the parties as expressed in their agreement or in their conduct thereafter.
Let me consider, first, the arguments urged by the plaintiff. The principles of law applicable here are well recognized. In order to create a joint venture, it is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Nor does an agreement to distribute the proceeds of an enterprise upon a percentage basis have the effect claimed by the plaintiff if the enterprise does not represent a joinder of property, skills and risks (Gordon Co. v. Garcia Sugars Corp., 241 App. Div. 155). An indispensable essential of a contract of partnership or joint venture, both under common *82 law and statutory law, “ is a mutual promise or undertaking of the parties to share in the profits of the business, and submit to the burden of making good the losses ” (Reynolds v. Searle, 186 App. Div. 202, 203). “ The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit” (Rabin, J., in Hasday v. Barocas, 10 Misc 2d 22, 28).
The case at bar does not, in my opinion, reveal such an amalgam of funds, of property, of skills, of risks or of interests as would create a joint venture. The plaintiff’s sole enforcible obligation was to lend $5,000, for which he was to receive a specified return — interest at the same rate Friedeberg was to receive on any loans Friedeberg would make, plus 10% of the profits of the corporation on the Carnegie agreement and any other business resulting from European trips. The plaintiff reserved to himself the option of further financing of an unspecified amount — for which he was to receive 33%% of the profits, inclusive of the 10% previously referred to. In my view, the provision made as to the profits was merely a mode of providing a compensation to the plaintiff for the use of the money he agreed to advance (Richardson v. Hughitt, 76 N. Y. 55). He was to have no proprietary share in the assets of the corporation or voice in its affairs or management. He was to perform no functions other than that of a lender. He was to assume no risks except for a possible loss of his advances. He was not obligated to suffer any losses. In short, in my opinion, the true construction of the agreement is that it was a contract between lender and borrower.
And this view is buttressed by what has previously been judicially determined in the intermediate stages of this litigation. Initially, the plaintiff set forth in his complaint causes of action at law for damages and causes of action in equity for an accounting — all based upon the agreement hereinbefore set forth. The counts seeking an accounting were dismissed at Special Term for insufficiency, and that determination was affirmed on appeal (283 App. Div. 918). The conclusion is inescapable that there was here no joint venture between the parties.
I shall consider, next, the argument of the defendants. I am prepared to find as a fact that the deal entered into by the parties on January 28, Is 18, was sparked by the contract, dated *83 January 19, 1948, between Carnegie and the defendant Friedeberg. And I recognize, of course, that, as a matter of law, “it is now well settled that when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation ” (Lorillard v. Clyde, 142 N. Y. 456, 462). But it does not follow that the transaction here involved, as finally formulated, did not in fact extend beyond its original motivating circumstances. In my reading of the document sued upon, I do not see that the Carnegie contract was so much the warp and woof of the agreement between the instant parties that, without Carnegie, there was no need for the further existence of the agreement and no further obligations of performance thereunder. I shall undertake to explain why I think so.
As is readily noticeable from a reading of the contract sued upon — in a preamble thereof and preceding any declarations of obligations — the letter agreement refers to the exhibiting to the plaintiff by Friedeberg of the Carnegie contract and states that “ [t]his letter is to confirm our agreement in respect thereto, as follows:”. And this is what the defendant stresses. But it is equally important to note that under the various provisions thereafter set forth — having to do with Friedeberg organizing a corporation to perform the Carnegie agreement and assigning that contract to the corporation and specifying the moneys to be loaned to the corporation by Friedeberg and the plaintiff “ upon [certain] terms ” and upon certain “ terms and conditions ” — that Friedeberg also undertakes to assign to the corporation “ any other business you [Friedeberg] do on this, or other European trips ”, and that the final operative paragraph (num. “7”) of the agreement provides that the plaintiff is to “ share in the profits of any other business which is the outcome of this or other European trips [of Friedeberg] in the same percentages and terms ’ ’ as previously mentioned. I hold that when this paragraph of the agreement refers to “ the same percentages and terms ”, what is intended does not have reference to the “term” or “termination” of the Carnegie contract, but rather to the ‘ ‘ terms ’ ’ of the transaction entered into between Friedeberg and the plaintiff as thereinbefore specified.
Nowhere in the preceding paragraphs of the letter is reference made to the expiration date of the Carnegie contract; and nowhere are the obligations of the parties in respect of “ any other business which is the outcome of this or other European trips” — either as a matter of calendar or of cancellation— *84 stated to be affected by the continuance of the Carnegie contract. In short, I hold that it was not the intent of the parties that abrogation of the Carnegie contract would effect a dissolution of the agreement entered into between the present parties. I am of the view that the absence of such intent is unambiguously expressed in the instrument itself.
If I am correct in this construction, then effect must be given to the expressed intent, for the court has no authority to make a contract for the parties or to revise the contract between them. But if I am in error, and it is held that, because of ambiguity, the intent cannot definitively be gathered from a study of the instrument on its own, resort may be had to the preliminary negotiations leading to the execution of the contract — not to contradict or vary the terms of the final agreement (Loch Sheldrake Associates v. Evans, 306 N. Y. 297, 305; Russell v. Marboro Books, 18 Misc 2d 166, 176; Verstandig & Sons v. Sobel, 26 Misc 2d 649, 651-652; cf. Hartog v. Mehle, 14 A D 2d 336), but to aid in the resolution of the ambiguity and the ascertainment of the intent of the parties and thus in the determination of the meaning of the signed document (Richardson, Evidence [8th ed.], § 601; Balkum v. Marino, 299 N. Y. 590, 592).
Upon the trial, therefore, I permitted the presentation of proof of the prior drafts of the instrument and parol evidence in relation thereto. The substance of that proof disclosed that during the negotiations language was at first used indicating that, in the event that the Carnegie deal fell through on the European trip earlier referred to, the plaintiff would share in the profits of any other business resulting from that trip. But the proviso that such sharing was to be dependent upon the nonconsummation of the Carnegie transaction was eliminated, and the business in the profits of which the plaintiff was entitled to share was expanded to include other European trips as well. Accordingly, clauses were inserted in the agreement as signed which provided for the assignment by Friedeberg to the corporation not only of the Carnegie contract, and also “ of any other business ”he does “ on this, or other European trips ”, and specifying that the plaintiff is to “ share in the profits ” not only of the Carnegie contract, but also “ of this or other European trips ” of Friedeberg. I conclude, of course, that the uncontradicted documentary proof makes assurance doubly sure as to the intent of the parties. While the Carnegie contract gave the breath of life to the agreement in suit, the cancellation by Carnegie did not cause the agreement between the parties to become lifeless.
*85 I hold, on the other hand, that the agreement is not one which would, against their subsequent will, bind the defendants in perpetuity. In support of my ruling in this respect, I need but note here several well-settled rules of contractual construction. “ The ordinary rule is that a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract ” (Holt v. St. Louis Union Trust Co., 52 F. 2d 1068, 1069). “ An interpretation calling for perpetual performance of a contract should be avoided unless a contrary intention of the parties is manifest ” (Freeport Sulphur Co. v. Ætna Life Ins. Co., 107 F. Supp. 508, 511; 1 Williston, Contracts [3d ed., Jaeger], § 38; Town of Readsboro v. Hoosac Tunnel & Wilmington R. R. Co., 6 F. 2d 733 [C. C. A. 2d]). “ True it is that the parties could have stipulated for performance perpetually, but it is a sufficient answer that they did not do so, and that no such conclusion is ever warranted in the absence of clear and unequivocal language which compels it” (Cronk v. Vogt’s Ice Cream, 15 N. Y. S. 2d 649, 654).
It is clear to me that there is, in the document which is the basis of the plaintiff’s suit, no language manifesting an intention to create in the plaintiff’s favor a perpetual contractual obligation on the defendants’ part. In my view, on the facts as disclosed in the ease at bar, the defendants were not, under the terms of this contract, beholden forever to pay the plaintiff a share of profits in return for his loan of $5,000. And it is undisputed that the plaintiff was duly repaid the amount of that loan in full.
When, then, does this contract end? Once again I invoice applicable canons of construction of contracts. ‘ ‘ Had the parties expressed the intention to make a promise for perpetual maintenance, we should, of course, have nothing to say; their words would be conclusive. But they did not, and, as no time is expressly fixed, we must look to the circumstances to learn what they meant” (Town of Readsboro v. Hoosac Tunnel & Wilmington R. R. Co., 6 F. 2d 733, 735, supra). There was no proof presented to me upon the trial to warrant a holding that the contract here involved had any fixed date of termination. WTiere ‘1 it appears that no termination date was within the contemplation of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be held to be terminable within a reasonable time or revocable at will, dependent upon the circumstances ” (Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., 178 F. Supp. 655, 661; Bailey v. S. S. Stafford, Inc., 178 App. Div. 811, 815; Zimco Restaurants v. Bartenders and Culinary Workers Union, Local *86 340, 165 Cal. App. 2d 235; Paisley v. Lucas, 346 Mo. 827; Freeport Sulphur Co. v. Ætna Life Ins. Co., 206 F. 2d 5).
Before pinpointing the manner and date of the defendants’ exercise of their permissible right of unilateral revocation, I should mention that, on June 15, 1949, after the cancellation of the Carnegie contract, Scrap Iron paid the plaintiff the sum of $12,000, in return for which the plaintiff executed and delivered to the defendants a paper — upon which appears the signed consent of Friedeberg — reading as follows: “ Received from SCRAP IRON & STEEL IMPORT CORPORATION TWELVE THOUSAND ($12,000.00) dollars — in full payment and discharge of any and all claims and demands now due or to become due under agreement between adole eriedeberg and b. e. mitler, dated January 28th, 1948, and I herewith release and discharge you and adole eriedeberg from any and all further liability thereunder, excepting, however, and reserving all claims for share of profits on any future European deals involving laundry stores, machinery, retail chain stores and/or scrap.”
The plaintiff urges that this document expressed an independent undertaking on the defendants’ part in respect of “ any future European deals involving laundry stores, machinery, retail chain stores and/or scrap ’ ’. I am not impressed with this contention. I hold, with the defendants, that, in the light of the plain wording of the writing, there was the creation of no new obligation, but rather an exception as to the operation of the release upon the defendants’ obligations under the basic agreement of January 28, 1948, in respect of any such specified “ deals ”, and if there were any profit thereon, the defendants are obligated to pay to the plaintiff his “ share of profits” thereof, as stipulated in that basic contract. This reservation can be quite clearly linked to paragraphs 1 and 7 of the basic contract, wherein it was agreed that the plaintiff would ‘ ‘ share in the profits of any other business which is the outcome of this or other European trips ”.
But, whether the June 15, 1949 instrument be deemed to be the expression of an independent promise on the defendants’ part or of an exception to the plaintiff’s release of the defendants in respect of the January 28, 1948 agreement, is of no moment on the question as to the duration of the defendants ’ obligations —• since, in either case, the contract (not providing for any agreed term) was terminable at will, and there was such termination on November 2,1950, when Scrap Iron wrote the plaintiff, among other things, that “ [a]s far as your [the plaintiff’s] interest in Adolf’s [the defendants’] scrap business is concerned and your agreements are concerned, they are concluded *87 and discharged.” This letter appears to me to be clear and explicit as to the issue of termination. November 3, 1950, when this notification was received by the plaintiff, is, I hold, the terminal date — since there is no proof that, at the time, there was a reasonable and probable likelihood of the defendants undertaking “ any future European deals involving laundry stores, machinery, retail chain stores and/or scrap ” — which, if there were, would, in my view, be a factor to be taken into account in fixing the time of their right to terminate their relationship with and obligation to the plaintiff.
Returning to a consideration of the receipt-release dated June 15,1949, the plaintiff admits that he received and retained the $12,000, but contends that the release was procured by fraud. He alleges that he was induced to sign the document by misrepresentations made to him by Friedeberg and one Lewis, an officer of Scrap Iron. These were alleged to be to the effect that the corporate defendant was compelled to pay out large sums of money to Carnegie in settlement of claims for explosions ; that Lewis exhibited to the plaintiff and his attorney a check stub showing a payment to Carnegie of $120,000; that it was difficult to get scrap out of Germany; that it was the intention of the defendants to clean up the scrap deal; that the expenses were higher than in fact they were; that the defendants concealed from the plaintiff that Carnegie was furnishing the money to the corporate defendant for freight and other items, which were charged against profits; and that in accordance with the books of account the plaintiff was entitled to $12,000 and no more.
I find that there was no proof of misrepresentation in fact. In support of his claim of fraud, the plaintiff relies heavily— and, in some aspects, exclusively — upon financial occurrences after the execution of the release. While it is perhaps not inappropriate, in certain circumstances, to keep in mind later happenings as an element in seeking to establish claimed fraud as of an earlier date, it is plain to me that the doctrine of nunc pro tunc cannot be the sole criterion in the case at bar. As I see it, whether there was misrepresentation in fact at the time of the execution of the release must be determined only on the basis of the conditions existing at that time. “ The mere fact that, in the light of subsequent events, one party has been benefited at the expense or detriment of the other is not sufficient to nullify an adjustment made by the parties willingly and knowingly.” (Blair v. Utica & Mohawk Val. Ry. Co., 112 App. Div. 609, 612.)
*88 The defendants showed at the trial that the situation on June 15, 1949, when the sum of $12,000 was paid and received in settlement, was as follows in respect of substantial charges against the corporation: cancellation of the Carnegie agreement; explosions in the scrap; damage claims to ships and demurrage; possible claims for taxes of the German Government; claims by the United States for revenue taxes; a claim for New York State franchise taxes; claims by a German firm for failure of the corporate defendant to pick up the remaining commitments for the purchase of scrap after the cancellation of the Carnegie contract; possible claims for injuries to third parties caused by the numerous explosions; claims by creditors of Friedeberg against Scrap Iron, the assignee of the Carnegie contract (which latter claims, while they may not necessarily be held to be deductible as against the plaintiff, might be considered so as a matter of fact and law, and, if not compromised, were large enough to wipe out all of the avails of the Friedeberg-Carnegie transaction).
It thus appears to me that, on June 15, 1949, when the settlement was made between the parties, profits from the Carnegie contract could only be estimated — if indeed they could even be guessed at — since there were possible and contingent liabilities, the amount of which could be resolved only at a much later period. This the plaintiff knew or recognized or was willing to take his chances upon — if he could (as he did) get $12,000 profit on a comparatively short-term repaid loan of $5,000, and at the same time reserve his claims to further profits on future business. I find therefore that, whether or not the statements made to the plaintiff and his representative at the time of the settlement were or were not accurate, the plaintiff did not at all rely upon them — and reliance is, of course, as much a required element of actionable fraud as the falsity of the representation itself (Adams v. Gillig, 199 N. Y. 314, 319; Reno v. Bull, 226 N. Y. 546, 550; Ming Hin Chin v. Fletcher, 21 Misc 2d 421, 426; McQuade v. Maidman, 207 Misc. 364, 368-369).
We now come to the question of damages claimed by the plaintiff. There is no question in my mind that — whether the plaintiff relies on the basic agreement of 1948 or on the receipt-release reservation of 1949 — the burden of proof as to that issue is on the plaintiff. As I stated at the outset, this is — in the present posture of the case — an action at law for damages. As such, as I see it, it was quite impermissible for the plaintiff to have sought to utilize or to rely upon the trial as a forum for an accounting by the defendants. Throughout the trial — and, *89 now, in respect of ultimate determination — the burden of proof is where the final pleadings have placed it (Lobdell v. Village of Northville, 151 App. Div. 384). In the light of the pleadings before me, the burden is on the plaintiff, as the party who has the affirmative (Heinemann v. Heard, 62 N. Y. 448, 455; Conkling v. Weatherwax, 181 N. Y. 258, 263-264), as the party who would lose if no evidence at all were introduced (Turl's Sons v. Williams Eng. & Contr. Co., 136 App. Div. 710, 712). Thus, the burden was on the plaintiff to establish the elements justifying any and measuring the amount of his recovery (Alexander’s Dept. Stores v. Ohrbach’s, Inc., 269 App. Div. 321, 329; Irving Shoe Co. v. Dugan, 93 F. 2d 711). The plaintiff was required to prove by a fair preponderance of the credible evidence just what those 11 future deals ” were and what “ profits ” were derived therefrom (Rosen v. Equitable Paper Bag Co., 286 N. Y. 410; 25 Fifth Ave. Management Co. v. Ivor B. Clark, Inc., 280 App. Div. 205, affd. 304 N. Y. 808). And the burden of demonstrating that an entirely new asset or liability item should be added to those contained in the business books and records regularly kept in the course of the corporate business was upon the plaintiff as the party making the affirmative assertion (Matter of Auditore, 136 Misc. 664, 671). Conjecture or speculation could not be substituted for proof. I find, on the facts presented, that the plaintiff has failed to prove that he is entitled to any damages on the basis of either the original contract or the exception clause in the release. On the contrary, I find that the defendants have proven a loss during the subsequent period when the reservation clause was in effect.
As to this matter of the defendants’ profits — both to sustain the plaintiff’s charge of the alleged fraud giving rise to the 1949 settlement, and as to the share of the profits reserved therein to the plaintiff in future deals by the defendants — the plaintiff points to the defendants’ nondisclosure of later transactions and the defendants’ refusal to allow the plaintiff access to all of the books and records of the business. It is quite obvious to me that the defendants grudgingly (and in some respects not at all) took the plaintiff into their confidence in relation to the affairs of the business — its income and expense, its prospects and gains and losses — and the defendants hesitantly and involuntarily made available to the plaintiff the records of the business. But it must here be recalled — in assaying the legal effect of the defendants’ lack of co-operation in that respect — that there was no contractual obligation (express or implied) on the defendants’ part to offer the plain *90 tiff any information or to permit him a discovery of any data or inspection of any records (Foster v. Parker, 282 App. Div. 766; cf. Boyle v. Wegman, 25 Misc 2d 193).
Nor does the fact that the plaintiff was compelled to invoke statutory remedies in order to examine the defendants ’ records ■ — • and that, in some respects, these procedures may have proved abortive — take the place of the proof required. Indeed, even had the defendants failed to submit upon the trial all the available documentary data, this nonproduction, in the light of the evidence presented upon the trial in the plaintiff’s behalf, could have had but a limited effect upon me as the trier of the facts. The applicable principle is stated in the early case of Life & Fire Ins. Co. v. Mechanic Fire Ins. Co. of N. Y. (7 Wend. 31, 33-34) where the court said: “ There is not a particle of evidence that the defendants ever actually received any portion of this money. It is said, however, that this fact would have appeared, if the books called for had been produced, and that the judge erred in not charging the jury that the refusal of the defendants to produce those books, afforded presumptive or prima facie evidence of that fact. I do not understand, the rule to be, that a party has a right to infer, from the refusal of his adversary to produce books or papers which may have been called for, that if produced, they would establish the fact which he alleges they would prove. The rule is this: The party in such a case may give secondary or parol proof of the contents of such books or papers, if they are shown or admitted to be in the possession of the opposite party; and if such secondary evidence is imperfect, vague, and uncertain as to dates, sums, boundaries, etc., every intendment and presumption shall be against the party, who might remove all doubt by producing the higher evidence. But they must be shewn to be in his possession, and some general evidence of such parts of their contents as are applicable to the case must first be given, before any foundation is laid for any inference or intendment on account of their non-production. The cases cited by the plaintiffs’ counsel shew this to be the true rule. (18 Johns. R. 331. 4 Burr. 2,484.) ” (But, see, 2 Wigmore, Evidence [3d ed.], § 285, p. 162; § 291, pp. 180-188, particularly p. 186.)
An analogy in that regard that comes readily to mind is the consequence of a party’s failure to summon a material witness under his control. In such ease, the unexplained omission of that party to call the witness would (if justified under all the circumstances of the case) warrant a trial tribunal sitting in this State in considering most strongly and favorably the evidence presented by the opposing party, which the testimony of *91 the witness not produced might have contradicted or explained; but the failure to call the witness in and of itself does not constitute evidence, because such omission raises no presumption and is not proof of the facts (see Milio v. Railway Motor Trucking Co., 257 App. Div. 640). “ The inference cannot take the place of evidence; it cannot supply a deficiency in the other party’s case nor can it be regarded as proof of any essential fact”. (Laffin v. Ryan, 4 A D 2d 21, 26; see discussion by Hofstadter and Richter, “ Effect of Failure to Call a Witness — New Rule Proposed ”, N. Y. L. J., editorial pages, June 4, 5 and 6,1956.)
Judgment is accordingly granted to the defendants dismissing the complaint on the merits.