Matthew M. Levy, J.
The petitioner moves for vacatur of an arbitration award upon the grounds (1) that it was procured by corruption, fraud, or other undue means and (2) that there was evident partiality in the arbitrator. The usual prayer for other relief is included in the notice.
The petitioner had stored certain furniture, furnishings and clothing with the respondent, a storage warehouse concern in New York City. She thereupon left the city, allegedly giving the respondent the address of a friend as the place to which her mail was to be sent. Upon returning to the city several months later, the petitioner called the respondent, informing it that she wished her chattels back, only to learn that that very day her property was being auctioned off, apparently for unpaid storage charges. The petitioner claims that this was the first notice she had of the sale. According to the petitioner, the property was worth $30,000. She rushed over to the warehouse with $600 in cash (the storage charges were less than that) and tendered full payment to the respondent’s president. Allegedly, he refused to accept the payment and insisted upon proceeding with the sale, notwithstanding personal protests by the petitioner and telephonic objections thereto by lawyers on her behalf. Moreover, she asserts, the auctioneer and the respondent refused to take any bids from the petitioner herself. The property was sold in the auction for a few hundred dollars.
The matter went to arbitration, pursuant to the contract of storage. In full settlement of the petitioner’s claim of $30,000, the arbitrator awarded her $483.04, and required her to pay $60, half of the arbitration fee. The allegations made by the petitioner— as to breach of the storage agreement on the part of the respondent, as to the conduct of the auctioneer during the sale, that personalty of substantial value was deliberately sold for a mere pittance, and that this was all a part of a scheme to defraud her of her property — are charges with which we are not now concerned. Since the parties submitted their controversy to arbitration, it is the procedure in the arbitration that concerns us, not the merits of the basic dispute as flowing from *685 the evidence adduced before the arbitrator.[1] This is true even though the witnesses may have differed as to what had occurred in respect of notice, tender or auction. For the available bases for vacatur are not issues as to the merits, but rather the claimed corruption, fraud, or other undue means in the procurement of the arbitration award or alleged partiality in the arbitrator or of any other misbehavior by which the rights of a party have been prejudiced (Civ. Prac. Act, § 1462).
The first ground presented by the petitioner to set aside the award is that the attorney for the respondent, it is said, was apparently favorably known to the arbitrator and had business transactions with him. This appearance, it is asserted by the petitioner in her affidavit, stemmed from the alleged fact that the respondent’s attorney started to say something to the arbitrator “ off the record” about recent business transactions that he and the arbitrator had been engaged in, when the attorney ‘ ‘ shut up ” abruptly upon a warning look from the arbitrator. When the petitioner asked what it was about, she was told that it was nothing and that it had nothing to do with the arbitration. Counsel advises her, the petitioner states, that this is evidence of the use of undue means to effect a result and of the arbitrator’s partiality. Concerning this “ off the record ” conversation with the arbitrator, the respondent’s attorney responds: “ Petitioner’s allegations at page 4 of her affidavit to the effect that I started to say something ‘ off the record ’ to Mr, Hill about *686 ‘ recent business transactions ’ that he and I had engaged in, is [are?] a figment of petitioner’s imagination conjured up at this late date as a last resort in an attempt to influence the Court. I emphatically deny that I knew or had any business dealings of any kind whatsoever with B. Douglas Hill prior to the hearings in the instant matter. Mr. Hill was chosen by the parties hereto as an impartial arbitrator pursuant to the rules of the American Arbitration Association. I have had absolutely no other business dealing with Mr. Hill prior to, during, or since the close of the hearings.”
Is this a denial of the existence of any business dealings with the arbitrator, or is it a denial that there was an off-the-record conversation about business dealings ? If this does not constitute an explicit denial that there was an in-camera off-the-record conversation between the arbitrator and the respondent’s counsel, it seems to me that it does not matter what was said in the conversation in the absence of the petitioner or not in her hearing.
An off-the-record conference by the arbitrator with both counsel[2] is not in the least impermissible (see Ballantine Books v. Capital Distr. Co., 302 F. 2d 17 [C. A. 2d]). But, unless the other party consent thereto, I take it that an arbitrator should not, during the arbitration proceedings (any more than should a Judge during a trial in a court of law), converse sotto voce with one of the parties or his counsel — that is, behind the back, so to speak, of the other party. To hold otherwise would, I think, render quite innocuous what is already a rather narrow sphere of judicial review of the proceedings leading to an arbitrator’s award. For, how, otherwise — as an example — is a judicial tribunal, when called upon to vacate or confirm an award, to know whether the arbitrator has or has not received ex parte “ evidence ” of which the other party is entitled to be aware and perhaps rebut (Matter of Horowitz v. Kaplan, 248 N. Y. 547; Berizzi Co. v. Krausz, 239 N. Y. 315, 318-319; Matter of 290 Park Ave. [Fergus Motors], 275 App. Div. 565; Matter of Dukraft Mfg. Co. v. Bear Mill Mfg. Co., 22 Misc 2d 1057; Matter of Katz [Uvegi], 18 Misc 2d 576, 583, affd. 11 A D 2d 773; Spitzer Elec. Co. v. Girardi Constr. Corp., 147 N. Y. S. 2d 40, 42-43). It is my belief that, in arbitration, just as in a court of law, it is not alone requisite to administer justice but so to conduct the proceedings as to make the parties feel that they are indeed being accorded justice.
*687 It may be, however, that what was hereinbefore quoted from the respondent’s attorney’s affidavit was intended to be a denial —- though somewhat obscurely expressed — of the petitioner’s assertion that there was any siib rosa conversation whatsoever, and that what now remains for consideration on this issue is that the petitioner has merely alleged, without attempting to bring forward any proof thereof, that the arbitrator had had business dealings with the counsel for the respondent and was therefore biased in the respondent’s favor. The counsel has categorically denied this.
Even were the petitioner’s allegation true, however, it would not in itself necessarily constitute a basis for disqualification of the arbitrator or for vacatur of the award (Matter of Cross Props. [Gimbel Bros.], 15 A D 2d 913; Matter of Meinig Co. [Katakura & Co.], 241 App. Div. 406, affd. 266 N. Y. 418; Matter of Atlantic Rayon Corp. [Goldsmith], 277 App. Div. 554, mot. for lv. to app. den. 278 App. Div. 567; Matter of Newburger v. Rose, 228 App. Div. 526, affd. 254 N. Y. 546), unless the nature and extent of such dealings would justify such action (see Botein, J., in Matter of Knickerbocker Textile Corp. [Donath], 22 Misc 2d 1056, affd. 282 App. Div. 680; McNally, J., in Matter of Dukraft Mfg. Co. [Bear Mill Mfg. Co.], 22 Misc 2d 1057, 1059, supra), and unless there was nondisclosure of such dealings to the complaining party (Matter of Milliken Woolens [Weber Knit Sportswear], 11 A D 2d 166, 168, affd. 9 N Y 2d 878). The state of the present affidavit record, pro or con, being inconclusive on this point, I would normally direct a hearing to take testimony thereon.
But I have come to the conclusion that the award should be vacated upon another ground altogether, which is presented on the record before me and therefore does not require the taking of testimony. That ground is that the respondent offered and the arbitrator received in evidence, over the petitioner’s protest, a certain written statement which should not have been in the case at all. That evidence consisted of a report prepared for the respondent by the Pinkerton Detective Agency. It is comprised of the several buff-colored pages attached to the moving affidavit. Contained therein are various highly unfavorable comments about the petitioner presumably gathered from her former neighbors, and a record of various lawsuits in which the petitioner was involved, and other data about her financial standing. It is conceded in the respondent’s answering affidavit that the petitioner made timely objection to the introduction of this report as evidence, and that she did not waive her right to object now. The respondent’s contentions are a denial that the arbi *688 trator was in any way partial or biased or that be was guilty of misconduct in accepting the Pinkerton report, which was, it is said, introduced merely to impeach the petitioner’s credibility; and the respondent argues that it is elementary that the legal rules of evidence do not apply in arbitration proceedings, so that the inadmissibility of the report upon a trial in a court of law does not affect the propriety of its acceptance by an arbitration tribunal.
By way of preface, I want to state that the issue here is an unusual one, for which I have found no precedents. For this reason, it may be useful to review the common-law evidentiary problems involved before proceeding to the question of whether the award is immune from attack because it was a determination in arbitration and not a judgment at law.
The Pinkerton report admitted in evidence — allegedly to impeach plaintiff’s credibility — is defective testimony by any test that would apply in a court of law. The narrative portions of the report are annexed as an exhibit hereto. They consist mostly of a dime-novel series of stories about the petitioner and her behavior, said to be gathered from former neighbors. It is hearsay of the most flagrant character. Indeed, it is hearsay on hearsay, consisting of statements made by neighbors to a detective as to what they had heard about the petitioner. The investigator put these statements in the report, but neither he nor his informants testified personally before the arbitrator. Neither he nor any of the persons who provided or recorded the alleged facts and opinions was put under oath or was made available for cross-examination in the arbitration proceeding.[3] All of the *689 valid reasons for the hearsay exclusionary rule come into play. (See 5 Wigmore, Evidence [3d ed.], §§ 1361,1362, for discussion of the lack of opportunity for cross-examination as the basis for the rule.)
Moreover, the report does not fall under any exception to the hearsay rule under our law. It was not competent as evidence to impeach credibility. A witness may be impeached by evidence that he has a bad reputation for truth and veracity in his neighborhood (Carlson v. Winterson, 147 N. Y. 652, 656). But a stranger sent out by the adverse party may not, for the purpose of impeaching credibility, testify as to the result of his investigation about a witness’ reputation for truth (People v. Loris, 131 App. Div. 127, 129). And such testimony must be confined strictly to the reputation of the witness for veracity; the impeaching witness may not testify to specific instances of want of veracity on the part of the witness whose credibility is in question (Theodore v. Daily Mirror, 282 N. Y. 345, 347; People v. Rodawald, 177 N. Y. 408, 424). Nor may specific instances of vicious, immoral or criminal conduct, which might tend to render one unworthy of belief, be testified to by the impeaching witness (Conley v. Meeker, 85 N. Y. 618). Yet, here, the evidence offered defied all of these rules: it was an investigator’s second- and third-hand report detailing specific acts of alleged avarice, malice and chicanery, not as such necessarily relevant to the issue of the petitioner’s credibility, but capable of placing plaintiff in a highly unfavorable light.
In short, as the most cursory examination of the report will indicate, it was prejudicial to the petitioner in the extreme, and was entirely inadmissible by any test in a court of law. It is perfectly correct, as the respondent argues, that, ordinarily, the rules of evidence do not apply to an arbitration proceeding. (See, e.g., Matter of Spring Cotton Mills [Buster Boy Suit Co.], 275 App. Div. 196, 200, affd. 300 N. Y. 586, mot. for rearg. den. 300 N. Y. 680; Matter of Spectrum Fabrics Corp. [Main St. Fashions], 285 App. Div. 710, 714, affd. 309 N. Y. 709; Petroleum Separating Co. v. Interamerican Refining Corp., 296 F. 2d 124.) The books abound in such statements. But the cases do not, I believe, embrace the instant situation. For there is a substantial difference between the receipt of merely incompetent or irrelevant evidence, and the receipt of thoroughly unfair evidence. None of the precedents that I have been able to discover deals squarely with the problem where, as here, evidence objected to is not only technically incompetent, but also entirely irrelevant and completely immaterial, and, in addition, inflammatorv and prejudicial to the highest degree.
*690 I recognize that, under existing law, an arbitration award may be set aside by the court only upon the bases specified in the statute (Civ. Prac. Act, §§ 1462, 1462-a; Matter of French Textiles Co. [Senor], 7 A D 2d 896; but, see, the intimation in the opinion at Special Term of Associate Judge Fboessel of the Court of Appeals in Matter of Rosenberg [Wolfe], 180 Misc. 500, 503, that11 the interest of justice ” is an independent test of the validity of an arbitrator’s award, apart from the enumerated statutory grounds for vacatur). Limiting my sights to the statutory provisions referred to, it is my view that the award here is tainted because it was “ procured ” by the respondent by ‘ ‘ undue means ’ ’ when the respondent offered the offending exhibit in evidence and that the arbitrator, in accepting the proffer, was “ guilty of misbehavior ” to such an extent as to “ prejudice” the rights of the petitioner (Civ. Prac. Act, § 1462, subds. 1, 3).
I have found no helpful cases — one way or the other — defining, in the present context, what is meant by “ undue means ”, “ misbehavior ” or “ prejudice And, in saying this, I have not overlooked the holding in Matter of Deering Milliken & Co. [Boepple Sportswear Mills] (4 A D 2d 652, affd. 4 N Y 2d 956). In that case, the contract giving rise to the arbitration limited the seller’s liability for breach in a certain way and provided further that the buyer shall not be entitled to claim consequential damages. The court declined to review the admission of evidence of consequential damages, as it was not apparent either from the award or the record that the arbitrators departed from the fixed formula for determining damages or that they allowed consequential damages. The court said (p. 653) that it “ certainly cannot ordinarily review the admission of evidence by arbitrators and cannot assume from the admission of irrelevant evidence that the award made was responsive to that evidence rather than to the standard of judgment provided by the contract ’ ’. But, as I have said, the offending evidence in the instant case obviously goes far beyond the merely irrevelant. It is my considered opinion that the submission of the Pinkerton report could have had no other purpose but improperly and adversely to affect the petitioner in her right to a fair hearing and determination on the issue to be arbitrated, and that the admission into evidence of the report was prejudicial to the petitioner.
The issue before the arbitrator was a simple, narrow one, stated by the respondent in the answering affidavit on this motion as follows, quoting from the petitioner’s claim in the arbitration: ‘ ‘ The claimant is seeking damages for the conversion and unlawful sale of a quantity of furniture, silverware, household effects, *691 linens and wearing apparel, and other items stored by the respondent and wrongfully sold by the respondent What possible relevance or materiality the principal statements contained in the report had to this issue I cannot see.
I shall take the liberty of paraphrasing and adding to what Judge Cabdozo had to say in another connection (Berizzi Co. v. Krauss, 239 N. Y. 315, 319, supra): The declaration of policy embodied in the Arbitration Act does not call for a complete relaxation of all restraints upon the presentation of proof before nonlawyer arbitrators or upon the conduct of arbitrators generally insofar, at least, as those restraints have relation to the fundamentals of a trial and the primary conditions of a fair hearing.
The motion to vacate the award is granted, and the matter is remitted to arbitration anew in accordance with the terms of the contract or submission.
=::= * *
EXHIBIT
Pinkerton’s national detective agency, inc.
Client Character of Case
Muller Brothers Inv. Mrs. Norma Brill
Office of Origin File No. Status
New York S 838 Continuing
Reporting Office Report Made By Date of Report
New York H. L. K. Thursday, October 13,1960
999#
IDENTIFICATION
Norma Brill is about 55 years of age, has been married but her .present marital status not known.
Resided at 112-35 — 69th Road, Flushing, L. I., N. Y., from early 1951 until April 1960. Neighbors interviewed call her a “ Terrible Woman ”. These neighbors stated she is a shrewd calculating and shifty person, who would stop at nothing to make money. They say she was married but do not know Mr. Brill’s business or what became of him, or if he is still alive or divorced or just separated from Mrs. Brill.
'She talked about being in the fur business in Midtown Manhattan and said she was fairly successful.
She arrived in this neighborhood in Queens in 1951, when a man named Charles H. Leger about 65 years old, who was said to be a friend of Norma Brill (whom she met in the fur business in New York City) came over here and he bought the house located at 112-35 — 69th Road, Forest Hills, N. Y. The price at that time was said to be $32,000.00. No one knew the exact financial arrangements made at the time, but all neighbors agree that this man Leger, paid a down payment for the house whatever amount was ream red at the time. The neighbors *692 say “ Leger ” bought this house because Norma Brill had promised him she would marry him, if he bought the house, showing his good intentions of really getting married to her.
It is said that she persuaded him to come and live with her in this house on the promise she would marry him later. However somehow he confided in her about holding out some financial items he should have noted in his Federal Income Tax returns and after that she used this information to threaten him, and finally persuaded him to sign the house over to her in her name. This was done about January, 1952.
On New Year’s Eve and Day, 1/1/1952 she looked him out of the house he bought for her. He was unable to get in and he walked around front of the house and finally was let in by a neighbor Mr. and Mrs. Philip Kelly and he told them a sad story of a scheming woman using him to get a $32,000.00 house and then getting rid of him, although he said he was firmly resolved to marry her. Said she had promised to take care of him and look after him as long as he lived and that he would never have to worry about his old age, that she would always look after him, but that instead she had thrown him out of the very home he had bought because she had asked him to buy it for her to show her he really loved her. After he .bought the house, she told him she would not marry him until he turned the deed of the house over to her, to show his sincerity so he signed the house over to her, and a couple of months later she locked him out of the house. She packed a suitcase with his belongings and left them outside the basement entrance to the house. He walked the street until about 3:00 a.m. and he finally rang the bell of the Kellys home at 112-29 ■— 69th Road. They let him in and let him sleep there that night. The following day he told the Kelly family that Norma Brill threw him out of his own home and which he had bought, and that he was aware she had another man visit her on week-ends. That she made a good deal of trouble for him. He told the Kellys that he was an investigator for the New York City Board of Education and was employed in the Legal Department, Specializing in Professional Law. He then left the Kellys saying he was going to give this matter of the “ House ” to the courts and try and get the house back again. After that she (Norma) Brill had her two daughters live there, one was named Janet who also got into a good deal of trouble about debts. Janet lived there for a time then Norma Brill threw her out of the house one night, and Janet also slept with the Kellys that night. The following morning Janet had to call the local police to get her personal belongings out of the house.
Janet is said to be about 30 years of age, her present whereabouts are unknown. The. other daughter Betty (now about 19 years of age) also left one day, and was never seen around the neighborhood again.
Norma Brill rented some of the rooms and at one time had a refined German woman roomer who had a son about six years old. This woman went to work and left the boy with Norma Brill. She was there a few months and Norma Brill accused her of not paying her rent for several weeks and threw her out. This woman also had a problem in getting her personal belongings out of the Brill house.
A short time later Norma Brill rented most of the house to a Brazilian family with two children. Asked $450.00 rent for her place and demanded three months rent as security in advance. These people paid her $1350.00 and Norma later accused them of not paying this money in advance. These people moved out and later took this case to court in Municipal Court, Non Jury Part at 8 Reade Street, New York. Norma Brill was represented by attorneys Rosoff and Rosoff of 29 Broadway, New York. Norma Brill then kept renting part of the house, furnished, to a number of people, however, none of whom remained long. She then ran out of money, secured a National City Bank loan and gave some place *693 of employment as a reference located on lower Park Avenue, New York. It seems she gave a fictitious employer, aiid received the loan. The bank had difficulty trying to collect this money, and had to go to court several times. Mrs. Brill tried to get another mortgage (already having two mortgages on the house) and went around to several of the neighbors with negative results. By this time she owed a lot of money, dealers were taking eases to court and banks threatened foreclosure and she finally sold the house to a Mr. Nathan H. Wadler, who has a doctor degree in teaching. He taught at Columbia University and was later sent to Israel to teach there. He is the present owner of the house. He rented the house to a Rabbi Mordecai A. Stern. The Rabbi had no information about Norma Brill.
There was a fire at Brill’s house the day after she left to go to Miami, Florida. Neighbors believe she had something to do about this fire. However, no proof or evidence was found by the Fire department, that it was of incendiary origin. She had the whole house refurnished with some fine furniture and after selling the house, she stored the furniture with Muller Brothers. There was some dispute about the sale of the house and the present owner Mr. Wadler had to go to court.
Her furniture was auctioned by Muller Bros. Storage and Warehouse people at 67 Drive and Queens Boulevard, Queens. Sale was held on 4/16/60. She (Norma) Brill, attended the sale and was bidding on her own furniture which it was said, was an attempt on her part to bid each item up and in this way derive more money from this sale. She was told by the auctioneer not to bid on her own furniture and this caused quite a disturbance at the time, threatening to sue everybody including Mayor Wagner.
A statement made by a Pinkerton’s National Detective Agency uniformed guard, Mr. Hillel Valentine who was on duty on day of the auction sale is attached to this report.
There is a list of suits and judgments against Norma Brill.
* * * «
October 14, 1960
Mr. Kenner
Investigating Department
Dear Sir:
In accordance with our telephone conversation on the morning of October 14th, I arrived at your office approximately 1:15 pm. Since no-one knew when you were expected to return, I thought it best to type out what I remembered about the case in question. (I would have waited for you but I had my family waiting for me in my ear downstairs).
As I remember the case, it was in early spring ... a storage company was auctioning off furniture at one of their warehouses on Queens Boulevard. My duty was to guard the articles that were to be auctioned off.
During the afternoon, after the bidding commenced, a lady approached me and mentioned that one of the bidders was bidding for her own furniture; she knew the bidder ... in fact, if my memory serves me correctly, she and her husband, purchased the house from the bidder and were therefore on personal terms with her. They (informant and husband) were aware of the furniture at the warehouse and made up their minds to ibid for them. The lady (informant) said that she knew that the bidder had no intentions of living up to the bids she was making.
I informed the auctioneer who stated that he had become aware of the situation. He spoke to the bidder. She stated that the auction of her furniture was against the law and that she was going to sue everyone connected with the unlaw *694 ful venture. There was an approximate 15 minute interruption during which time the bidder was loud and boisterous. I do not remember her using any vile language but she did manage to disrupt the proceedings. The auctioneer finally persuaded her to report to the office of the Storage Co. (Muller Bros,) to make a formal complaint. I escorted her to the main office. When I returned, the auctioning continued without any further interruption.
Hillel J. Valentine
Security Guard
Shield #2213
Note : Bidder mentioned above was Norma Brill. (HJL)
Witnessed by H. L. Kenner

. On the argument of the motion, the following minute was made:
“the coübt: The moving party raises the issue that stenographic minutes
were taken of the arbitration proceedings, and they have not been presented by the respondent, and that in consequence I should draw some inference resulting from that omission.
“ The respondent states that it deliberately refrained from presenting the voluminous record before the arbitrator because the respondent does not want to relitigate the matters which were before and properly before the arbitrator under the contract.
“ Decision reserved.”
There are other factors on this motion, aside from the merits of the controversy, that might have been clarified one way or the other by having the transcript of the arbitration proceedings and hearings before me. But, of course, the burden is on the moving party to justify the vacatur of the award, and she might have subpoenaed the minutes (Civ. Prac. Act, § 406) or asked for admissions (Civ. Prac. Act, § 322) or taken the testimony of the arbitrator or stenographer (Civ. Prac. Act, § 307) if she did not (or were unable to) obtain a transcript of her own — which is not indicated in her affidavit.
The correct “inference” that I might draw because of the respondent’s non-production is more fully set forth in Mitler v. Friedeberg (32 Misc 2d 78, 90-91). But, in any case, in arriving at my determination of the basic issue on this application, I do not rely upon any inference because of the unwillingness of the respondent to submit the entire record to the court.

. Or, as would ,be the situation in the ease at 'bar, with respondent’s counsel and the petitioner in person, since she does not appear to have been represented in the arbitration hearing by an attorney.

. A point not raised by the petitioner is worthy of mention ■ — certainly by way of footnote, for the sake of complete presentation, if for no other.
Neither the contract nor the submission nor the minutes of the hearing before the arbitrator w'ere presented to me. It appears, however, to be implicit from the record that is before me — such as some of the statements in the affidavits and the reporter’s stamp on the exhibits — that the proceedings were conducted in accordance with the Rules of the American Arbitration Association. If so, it would seem that the testimony of the Pinkerton detective should have been submitted in person, and if not that, at least by way of affidavit, rather than as an unsworn statement.
Rule 31 of the Commercial Arbitration Rules of the American Arbitration Association provides that: “ The Arbitrator may receive and consider the evidence of witnesses by affidavit, but may give it only such weight as he deems it entitled to after consideration of any objections made to its admission ” (see Matter of Milliken Woolens [Weber Knit Sportswear], 20 Misc 2d 504, 509, revd. 11 A D 2d 166, affd. 9 N Y 2d 878).
This would appear — without question - — to preclude the receipt in evidence of the investigator’s unsworn report, even were an affidavit of the data, comments and opinions contained in the present exhibit admissible (as urged by the respondent) on the question of the petitioner’s credibility.