OPINION OF THE COURT
Richard A. Goldberg, J.
This decision presents a novel question in this jurisdiction; whether an agreement for the sale of stock in a business corporation may be set aside when the underlying purpose of the sale is frustrated by unforeseeable circumstances.
The underlying facts are as follows: The petitioner, John Agosta, and his brother Salvatore Agosta are equal owners of all the issued and outstanding stock in the close corporation known as Fontana D’Oro Foods, Inc. The corporation is engaged in the warehousing and wholesaling of food stuffs and condiments to the pizza trade. By far, the major asset of the corporation consisted of its warehouse where inventory was stored awaiting shipment to the corporation’s customers.
*1092 Disagreements occurred between the two brothers as a result of which it became impossible to operate the business. Petitioner, John Agosta, then commenced this petition for voluntary dissolution of the corporation pursuant to section 1104 of the Business Corporation Law.
The matter appeared before this court on November 24, 1982, at which time a stipulation was placed on the record in open court “settling” the matter by the contemplated sale of the corporate stock owned by Salvatore to his brother John for a total purchase price of $500,000. The terms and conditions of the “settlement” were set forth at length upon the record.
Specifically, the stipulation states, “Salvatore Agosta hereby sells to John Agosta all of the outstanding corporate stock not presently owned by John Agosta in Fontana D’Oro Foods, Inc.” The settlement stipulation required various documents to be executed and to be released at the closing, to wit, various Uniform Commercial Code security agreements, a second mortgage to be placed on the corporate premises and further security in the form of a personal guarantee by John Agosta. Certain corporate properties consisting of vehicles were to be turned over to Salvatore and Salvatore agreed to resign as an officer, director and employee of the corporation after a “winding down” period. John Agosta retained the right to retire the stock or take it in his own name.
Although the case had supposedly been settled by virtue of the stipulation of November 24,1982, difficulties ensued and a further stipulation was entered into in court on December 13, 1982, modifying the prior stipulation in certain respects; primarily by increasing the purchase price to $505,000 and committing John Agosta to transfer certain real property owned by him jointly with his brother Salvatore, to the sole ownership of his brother. As so modified the prior stipulation was affirmed. A $20,000 deposit was given by John Agosta which sum has since been paid into court.
The closing never took place. Shortly before the adjourned date for closing, a fire totally destroyed the warehouse and all its contents, and the corporation was unable to continue as a going business.
*1093 John refuses to tender the additional payment or to complete the purchase of Salvatore’s interest in the corporation. Salvatore then brought the instant motion to compel John to complete the closing.
Although at one time a stipulation of settlement could only be enforced, vacated or modified by initiating a plenary suit, presently a party can under proper circumstances seek to enforce such a contract by motion. The court retains supervisory control over the action so long as the parties have not executed an express unconditional stipulation of discontinuance or have actually entered judgment in accordance with the terms of the stipulation. (Teitelbaum Holdings v Gold, 48 NY2d 51; Sawyer v Pepe, 90 AD2d 647.)
Since the within proceeding was never unequivocally discontinued by the execution of a stipulation of discontinuance, nor a judgment entered pursuant to the terms of the settlement, this court has the authority to entertain a request for enforcement or relief from the contract by motion, or, as here, by order to show cause.
The question of whether the stipulation may be specifically enforced or whether John’s nonperformance can be excused hinges on how the agreement is classified. That is to say, whether the court views the agreement as one for the purchase and sale of corporate stock or rather for the purchase and sale of a functioning business enterprise.
If the court considered the stipulation as one simply for the purchase and sale of corporate securities it would have to grant specific performance.
Concededly, the value of the stock has declined as a result of the fire. However, John could not be heard to complain on this account because of the well-known commercial policy which prevents one who has contracted to purchase securities from avoiding his obligation by reason of a decline, even a severe one, in the value of what he has agreed to buy. Additionally, the doctrine of impossibility of performance is inapplicable to the case at bar. In general, impossibility of performance may be equated with an inability to perform as promised due to intervening events, such as an act of State or destruction of the subject matter *1094 of the contract. (United States v General Douglas MacArthur Senior Vil., 508 F2d 377.) When performance depends on the continued existence of a thing, and such continued existence was assumed as the basis of the agreement, the destruction of the thing puts an end to the obligation. (Mitler v Friedeberg, 32 Misc 2d 78.) Here, the subject matter, the shares of stock in the corporation, were not destroyed. The shares of stock are presently capable of being transferred.
It is well settled that ownership of stock does not represent ownership of any of the underlying corporate assets (First Nat. Bank & Trust Co. v Novick Realty Corp., 68 AD2d 191) and that even complete ownership of stock does not operate to transfer title to corporate property. (Torrey Delivery v Chautauqua Truck Sales & Serv., 47 AD2d 279.) However, to consider the stipulation in question as merely a contract for the transfer of corporate stock as it might appear on its face would be to focus on one aspect of the agreement and to ignore the real intent of the parties. It would ignore the very context in which the agreement was entered into. It was contemplated that Fontana D’Oro Foods, Inc. would continue as a going business enterprise, changing merely from a company jointly owned and operated by John and Salvatore to one owned and operated by John alone. Transfer of the securities was a coincidental formality.
Analysis of the stipulation as a whole clearly demonstrates the accuracy of the foregoing conclusion. The promissory note to be given by John covering $300,000 of the purchase price was to be secured by a pledge of stock, a filed security interest on the inventory, fixtures and equipment of the corporation, a second mortgage on the corporation’s premises and by John’s personal guarantee. John also obligated himself to indemnify Salvatore for all corporate obligations of which Salvatore was a guarantor as of July 31,1982, to the extent that Salvatore was not relieved of those guarantees by the lenders themselves. As part of the over-all consideration the parties transferred between themselves jointly owned real property and even corporate property. It is clear that both parties were treating the underlying corporate assets and liabilities and, indeed, the *1095 operation of the corporation itself, as their own personal property and obligations and that the terminology of the stipulation classifying the transaction as one for the sale of stock was an unfortunate misnomer not representing the true intent of the parties. While transfer of the corporate securities was most certainly contemplated it was but a minor ministerial act when viewed in the over-all context of the transaction.
Recently, the courts have been encouraged to recognize a “sale of control” exception in this type of transaction. (Thomas, A New Look at 10B-5: The Sale of Business Doctrine, 33 Syracuse L Rev 999.)
Although up to this point New York courts have not gone that far, there is recent support in some Federal jurisdictions for the process of looking beyond the coincidental transfer of securities when what is actually being transferred is control of a corporate entity. (Frederiksen v Poloway, 637 F2d 1147, cert den 451 US 1017; King v Winkler, 673 F2d 342; Chandler v Kew, Inc., 691 F2d 443.) These courts, in defining the scope and applicability of Federal securities laws, have looked to the “economic realities” of the transaction to determine whether a purchase and sale was of securities, or of a business enterprise. In examining these so-called economic realities, a pivotal factor is whether the purchaser intends by his purchase merely to make a disinterested financial investment (such as buying 100 shares of General Motors stock), or whether he will depend, for a return on his money, upon his own efforts as an entrepreneur. (Securities & Exch. Comm. v Turner Enterprises, 474 F2d 476, 482, n 7, cert den 414 US 821; Williamson v Tucker, 645 F2d 404; Frederiksen v Poloway, 637 F2d, at p 1153.)
Applying this analysis to the case at bar lends additional support to the court’s conclusion that what was contemplated was the sale of a business. Both John and Salvatore have been actively involved in the day-to-day management of the company, and it seems likely that once the terms of the agreement were effectuated, John’s expectation of profits would have depended largely, or entirely, on his own efforts and his own knowledge of the business.
*1096 Admittedly, not all Federal jurisdictions have adopted these “sale of business” principles (e.g., Golden v Garafalo, 678 F2d 1139; Coffin v Polishing Machs., 596 F2d 1202, cert den 444 US 868). In cases such as this one, however, in which a closely held corporation passes to the dominion of a sole shareholder through a single transaction, the “sale of business” doctrine is reflective of the true intent of the parties. To view this agreement as simply one for the sale of stock and not as one for the sale of a going business would be to exalt form over substance.
The court now turns to the question of whether a supervening event has occurred of the type necessary to excuse nonperformance.
Frustration of purpose is a corollary of the defense of impossibility of performance. The doctrine has its origin in what are known as the coronation cases. In Krell v Henry (2 KB 740 [1903]), the defendant was excused from his duty of payment for use of the plaintiff’s apartment along the route of the coronation procession, when the procession was canceled because the King became ill.
In modern legal parlance, frustration of purpose refers to a situation where an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible, thus operating to discharge a party’s duties of performance. (See Dobbs, Remedies, § 13.3; Restatement, Contracts, § 288; New York Trust Co. v Securities & Exch. Comm., 131 F2d 274, cert den 318 US 786, reh den 319 US 781 [concluding that the venture had been frustrated]; Ann., 84 ALR2d 12, 74; United States v General Douglas MacArthur Senior Vil., 366 F Supp 302, affd 508 F2d 377, supra.)
We are faced with just such a set of circumstances in the instant case. As a result of the fire, performance by Salvatore Agosta would no longer give John Agosta a going business, which is what induced John Agosta to enter into the contract. Although some parts of the business still exist, for all practical purposes that business has been destroyed by the fire. As a result of that fire, the purpose of the contract has been frustrated since there is no longer a functioning business to purchase.
*1097 In order to succeed under the doctrine of frustration of purpose, the supervening event must be one which was not foreseeable by the parties. (18 Williston, Contracts [3d ed], § 1954; Frenchman & Sweet v Philco Discount Corp., 21 AD2d 180.) That the parties anticipated the possibility that a fire could destroy their warehouse and inventory is not in doubt. Both must have known, through their involvement in the company’s affairs, of insurance coverage on these assets, as well as the existence of a policy covering business interruption. What could not have been foreseen, was the possibility (which has matured into a fact) that the insurance carrier would withhold payment of the corporation’s claim based upon its arson investigation. Counsel has advised the court that the present status of that investigation is not known, but it is not likely that the company will receive compensation for its losses in the foreseeable future, if at all. It is conceivable that the company will recover nothing, and also possible that due to the extended interruption in the company’s operations, it may be difficult or impossible for the company ever to resume business, even if the insurance claim is paid in full.
When viewing the stipulation as one for the conveyance of an interest in an operating business it becomes apparent that this purpose has been frustrated by subsequent events that neither side could have reasonably anticipated. (22 NY Jur 2d, § 362.)
The commercial policy which prevents a contract vendee of corporate stock from escaping his obligation to complete the purchase despite a diminution in value between the time of contract and the time of closing clearly applies when dealing with publicly traded securities or stock purchased primarily for investment purposes. Where, as here, the purpose of the contract to buy or sell corporate stock is to convey control of a functioning business, the court has the equitable power to set aside the purchase agreement when the purpose has been frustrated by unforeseeable circumstances.
The motion for specific performance is denied. All moneys advanced by the purchaser and which have since been paid into court are to be returned to him.