Paul W. Havener v. Commissioner. Paul W. Havener and Mary Elizabeth Havener v. Commissioner.
Havener v. Commissioner
Docket Nos. 92212, 92213.
United States Tax Court
T.C. Memo 1964-91; 1964 Tax Ct. Memo LEXIS 244; 23 T.C.M. (CCH) 539; T.C.M. (RIA) 64091; April 9, 1964
Sidney Pepper, 120 Broadway, New York, N. Y., for the petitioners. Robert D. Whoriskey, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Addition to Tax
I.R.C. 1939
I.R.C. 1954
Docket
Sec. 294
Year
No.
Deficiency
Sec. 291(a)
Sec. 293(a)
(d)(1)(A)
Sec. 6654
1952
92212
$135,786.40
$27,155.24
$12,216.20
1953
92212
14,170.83
$708.54
1,261.12
1954
92213
899.45
1955
92212
1,711.36
1956
92212
731.42
$33.52
The issues presented for our decision are (1) whether petitioner held real property primarily for sale to customers in the ordinary course of his trade or business during 1952, 1953, and 1954; (2) whether petitioner and his mother, Ann Mercer Koechl, held and disposed of their family estate as joint venturers; (3) whether petitioner properly computed the basis of the real property disposed of during the years in issue; (4) whether *247 certain expenditures and selling costs claimed as expenses connected with the sale of real property during 1952, 1953, and 1954 are deductible; (5) whether unreimbursed business and travel expenses are deductible for 1952, 1953, and 1954; (6) whether certain unreimbursed business expenses claimed by petitioner in the amount of $1,200 on his return for 1956 are properly deductible; (7) whether dependency exemptions claimed by petitioner for his son, George Havener, for the years 1954, 1955, and 1956 were properly claimed; (8) whether petitioner is liable for self-employment tax for 1952 and 1956; (9) whether petitioner is liable for an addition to tax for failure to file a timely income tax return for 1952 under section 291(a) of the 1939 Code; (10) whether petitioner is liable for an addition to tax for negligence for 1953 under section 293(a) of the 1939 Code; (11) whether petitioner is liable for additions to tax for failure to file declarations of estimated tax for 1952 and 1953 under section 294(d)(1)(A) of the 1939 Code; and (12) whether petitioner is liable for an addition to tax for underpayment of estimated tax for 1956 under section 6654 of the 1954 Code. General Findings *248 of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife with their principal mailing address c/o Havener Securities Corporation, 165 Broadway, New York, New York. Petitioner Paul W. Havener filed his individual income tax returns for 1952, 1953, 1955, and 1956 with the director for the Lower Manhattan District, New York, New York. Petitioner and his wife, Mary Elizabeth Havener, filed their joint income tax return for 1954 with the director for the Lower Manhattan District, New York, New York. Paul W. Havener will hereinafter be referred to as petitioner. Petitioner and his mother, Ann Mercer Koechl, filed partnership returns (Form 1065) for 1955 and 1956. In 1927, subsequent to the death of petitioner's father, his mother married Otto R. Koechl. At the time of his marriage Otto R. Koechl owned an estate located at Huntington, Long Island, New York. This estate consisted of approximately 310 acres of land which contained a 10-room, 2-story stone dwelling, a garage with living quarters, a 10-room farmhouse, a superintendent's cottage, barns, stables, and other buildings, as well as a large swimming pool, tennis court, and *249 walled formal gardens. This estate is sometime hereinafter referred to as the Dix Hills property. The Dix Hills property was occupied by Otto R. Koechl, his wife, and petitioner from 1927 until September 1933. As a result of the stock market crash of 1929 Otto R. Koechl lost more than three million dollars which he had invested in stock and securities. These investments constituted substantially everything he owned apart from the Dix Hills property. Following the loss of his investments in 1929, Otto R. Koechl made every effort to save the Dix Hills estate from foreclosure and to maintain his former standard of living. Between 1929 and 1933 he borrowed $86,000 from his wife, $20,700 from petitioner, $40,736.30 on his life insurance, and additional amounts from other relatives and friends. On July 8, 1933, Title Guarantee and Trust Company, which was mortgagee of record for consolidated mortgages, totaling $60,000, on the Dix Hills property, commenced an action against Otto R. Koechl and Ann Mercer Koechl in the Supreme Court, Suffolk County, New York, to foreclose those mortgages. The consolidated mortgages were certificated with participation certificates which were held by *250 the public. On September 14, 1933, Otto R. Koechl executed a will in which he left all his property to his wife and appointed her executrix of his estate. On September 24, 1933, Otto R. Koechl committed suicide and his will was admitted to probate by the Surrogate's Court, Suffolk County, New York, on October 5, 1933. His widow, Ann Mercer Koechl, thereafter was substituted as party defendant individually and as executrix of the estate of Otto R. Koechl in the above-mentioned mortgage foreclosure action. Following the death of Otto R. Koechl, petitioner's mother was advised by her attorneys to transfer title to the Dix Hills property to petitioner and thereby to retain the property in the family rather than permit it to fall into the hands of mortgage creditors. Consequently during the severe economic depression of the mid-thirties, petitioner and his mother decided to retain the Dix Hills estate and attempt to recover their expenditures without sacrificing the property at a distress price. They agreed that he should negotiate settlement with the mortgage holders who had commenced the foreclosure action on the Dix Hills property, take title to the property in his own name, and *251 endeavor to hold on to the estate until such a time as it could be liquidated under more favorable market conditions. They further agreed that, in the event of the future liquidation of the Dix Hills estate, petitioner would reimburse himself to the extent of his expenses connected with the maintenance of the property, plus the loan in the amount of $20,720 he had made to his stepfather, and then return to his mother the balance of the proceeds to the extent of her investment in the property and, in the event of any excess, the proceeds would be divided equally between them. Because of the high maintenance costs connected with the Dix Hills estate, it was not readily marketable property. On November 10, 1936, the Mortgage Commission of the State of New York intervened as a party plaintiff in the mortgage foreclosure action involving the Dix Hills property. This intervention was for the purpose of the rehabilitation of the Bond and Mortgage Guarantee Company, an affiliate of Title Guarantee and Trust Company. The Bond and Mortgage Guarantee Company had guaranteed payment of mortgage participation certificates held by the public under the consolidated mortgages for which the Title *252 Guarantee and Trust Company was the mortgagee of record. On November 30, 1937, N. M. Lord who, in 1934, had acquired tax liens on the Dix Hills property conveyed his interest to petitioner for $1,946.05. Petitioner also purchased mortgage participation certificates in the face amount of $40,000 which were held by the public under the consolidated mortgages then being foreclosed. On December 9, 1937, a judgment of foreclosure was entered with the County Clerk of Suffolk County, New York, in favor of the Mortgage Commission of the State of New York, in the foreclosure action involving the Dix Hills property. Thereafter petitioner negotiated for the acquisition of the estate from the Mortgage Commission of the State of New York. On March 2, 3, and 4, 1938, the holders of participation certificates in the consolidated mortgages secured by liens on the Dix Hills property executed consents authorizing the Mortgage Commission of the State of New York and/or the Title Guarantee and Trust Company to convey the property upon payment of $60,000 in cash, plus all service charges, allocation costs, and foreclosure expenses of the Mortgage Commission Servicing Corporation. Early in March 1938, *253 petitioner applied to the Suffolk County Federal Savings and Loan Association for a $20,000 loan to be secured by a first mortgage on the property. On March 3, 1938, the Title Guarantee and Trust Company of New York certified that marektable title to the Dix Hills property could be conveyed by the referee in the foreclosure action. On March 5, 1938, the petitioner applied to the Title Guarantee and Trust Company for a certificate insuring the Suffolk County Federal Savings and Loan Association as a first mortgagee on the Dix Hills property in the amount of $20,000. On March 5, 1938, the attorney for the Mortgage Commission of the State of New York and the Title Guarantee and Trust Company and the attorney representing Ann Mercer Koechl stipulated in the foreclosure action that an appeal which she had filed from the order of the Supreme Court of the State of New York granting the Mortgage Commission summary judgment and from the judgment of foreclosure would be withdrawn. The parties further stipulated that a joint motion filed by the Mortgage Commission for the dismissal of the appeal would also be withdrawn. On March 11, 1938, the referee appointed by the Court following the judgment *254 of foreclosure of the consolidated mortgages on the Dix Hills property conducted a mortgage foreclosure sale. The property was sold for $1,000 which was the amount bid by the Mortgage Commission Realty Corporation, a wholly-owned subsidiary of the Mortgage Commission of the State of New York, as trustee for certificate holders of the mortgage being foreclosed. On March 14, 1938, holders of outstanding certificates of participation in the mortgage secured by the Dix Hills property caused their consent to the plan of reorganization of the said mortgage to be filed with the County Clerk, Kings County, New York. The Mortgage Commission Realty Corporation by deed dated March 21, 1938, conveyed title to the Dix Hills property to petitioner for $60,000, subject to unpaid taxes. The consideration in the amount of $60,000 paid by petitioner for the acquisition of title to the property consisted of $20,000 in cash which he previously had borrowed from the Suffolk County Federal Savings and Loan Association and mortgage participation certificates in the face amount of $40,000. Following the acquisition of title to the Dix Hills property, petitioner satisfied the unpaid realty taxes and *255 paid the mortgage participation certificate holders in full together with interest. Issue 1. Sale of Dix Hills Property Findings of Fact Petitioner and his mother resided on the Dix Hills estate from 1927 until 1951 when they rented the residence to Charles Re. The furniture used in the residence was never removed until the 175-acre parcel of land which included the residence was sold in 1952 to Charles Re and Edward C. Cantelmo. No part of the Dix Hills tract was sold until 1941 when petitioner sold three parcels (one consisting of 3 acres, one of 1 acre, and one of 2 acres) to Morton Waddell and Catherine W. Waddell, personal friends who had approached him requesting to purchase a portion of the property. Two other parcels (one of 5 acres and one of 15 acres) were sold in 1941 to two individuals who sought out petitioner and made inquiry concerning the possibility of purchasing certain parcels of the estate. Petitioner consented to sell these parcels in 1941 because of his pressing need for additional funds. No further sales were made of the Dix Hills estate until 1945 when petitioner sold 10 acres to William Erb, a neighboring farmer, and 3 additional acres to his personal *256 friends, Morton and Coretta J. Waddell, who had purchased the first three parcels in 1941. During 1946 petitioner sold a 4-acre parcel of the Dix Hills property to Ludwig Rudy and an additional 3 acres to Morton and Coretta Waddell. During 1947 a 4-acre parcel of the property was sold to the New York Telephone Company. In 1949 petitioner sold a 32-acre parcel from the estate to Edward W. Harbes. During 1950 a 2 1/2-acre parcel was sold by petitioner to Francis J. Lorenz and in 1951 he sold four additional parcels of approximately 1 acre each. All of the sales of parcels of the Dix Hills property during 1941 through 1951 were made by petitioner without the intervention or assistance of real estate brokers and were made either to personal friends or to individuals who approached him requesting to purchase a parcel of land. During 1950 the petitioner employed a surveyor to make a map of 34 acres of interior land (described as Totten Woods) located on the Dix Hills estate showing five parcels of property and streets laid out as designated by the local planning board of the Town of Huntington, New York. This map was made in order to comply with the requirements of the New York *257 Town Law which controls the sale of unimproved land having no access to an existing street or highway. For the purpose of facilitating the sale of his inaccessible interior land, petitioner filed the above-mentioned map of the Totten Woods area with the County Clerk for Suffolk County, New York, on March 15, 1951. During 1952 petitioner gave a nonexclusive sales listing on 15 to 20 acres of the estate fronting on Vanderbilt Parkway to Louis A. Cascone, a real estate broker. Petitioner also gave Cascone a nonexclusive listing for a portion of the Totten Woods section of the estate. As a result of his efforts five parcels of the Dix Hills property were sold. On April 1, 1952, petitioner executed an exclusive agency agreement with Douglas L. Elliman & Co., a real estate broker. The agreement authorized the broker to sell either the entire 175-acre tract which subsequently was sold to Charles Re and Edward C. Cantelmo or a 25-acre portion thereof which included the main residence, swimming pool, and walled gardens. On October 15, 1952, petitioner, without the assistance of Douglas L. Elliman & Co., or of any realtor, executed an agreement to sell 175 acres of the Dix Hills estate *258 including the stone residence and the area immediately surrounding it to Charles Re, who was then renting the premises, together with his friend, Edward C. Cantelmo, for $189,873.51. Of this amount $50,000 was paid in cash at the time of settlement on October 31, 1952, and the balance was in the form of a mortgage note. During 1952 petitioner sold approximately 181.7 acres of the Dix Hills property in eight separate transactions for a total price of $200,998.51, consisting of the above-mentioned sale of 175 acres including the dwelling house to Charles Re and Edward Cantelmo in addition to approximately 7 acres in seven different transactions. During 1953 petitioner again employed a surveyor to make another map of 17 acres of his land which lay south of the 175-acre parcel sold to Charles Re and Edward Cantelmo in 1952. This map was not filed and the parcels of land appearing thereon were not sold. During 1953 petitioner engaged Frederick Krueger, a real estate broker, to sell lots located in the Totten Woods area of his estate. A portion of the Dix Hills estate which was located south of the 175-acre tract previously sold in 1952 to Charles Re and Edward Cantelmo was sold during *259 1953 and 1954. During 1953 petitioner sold 15.5 acres of the Dix Hills property in 10 different transactions for a total sales price of $23,184.50. During 1954 only 1 acre of the property was sold. From 1941 to 1954, inclusive, petitioner sold approximately 287.6 acres of his estate (out of a total of 310 acres) in 35 transactions for a total sales price of $266,833. At the end of 1956 petitioner still owned approximately 22.5 acres of land located on the Dix Hills estate. Apart from the 175-acre tract on which the dwelling house was situated, the land sold by petitioner during 1952, 1953, and 1954 was completely unimproved. He made no effort to develop these parcels in any way, except for establishing bridle paths. The brokers employed by Paul Havener occasionally advertised a portion of the Dix Hills property for sale. Petitioner spent no more time in connection with the disposition of the parcels of land located in the Dix Hills property than was necessary in order to converse with prospective purchasers and brokers or to execute conveyances. He has never owned any real estate other than the Dix Hills property and has never held a real estate broker's license. From 1931 through *260 1954, petitioner was engaged continuously as a stockbroker or in some phase of the securities business with the exception of a period of approximately 1 1/2 years during 1953 and 1954 when he was employed as an outside salesman and vice president of the Feldt Manufacturing Company, which had its principal place of business in Dallas, Texas. During 1951, 1952, and 1953, petitioner incurred additional financial obligations. His mother, whom he had supported since the death of his stepfather, became seriously ill and was hospitalized. During 1951 he sold certain securities at a substantial loss. During the years here involved he contributed substantially to the support of his three minor sons and made regular alimony payments to a former wife. On his income tax returns for 1952, 1953, and 1954, petitioner reported the amounts realized from the sale of parcels of the Dix Hills property as offsets against his "unrecovered basis" therein and reported neither gain nor loss. In his deficiency notices for 1952, 1953, and 1954, respondent determined that petitioner realized ordinary income from the sale of real estate held primarily for sale to customers in the ordinary course of his trade *261 or business. During the years in issue petitioner was not engaged in the trade or business of selling real estate. The parcels of property located on the Dix Hills tract which were disposed of during those years were not held by him for sale to customers in the ordinary course of his trade or business. Opinion The petitioner has taken the position that the parcels of the Dix Hills estate sold by him during 1952, 1953, and 1954 were not held primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 117(a)(1) and (i)(1) of the Internal Revenue Code of 1939[1] and section 1221 of the Internal Revenue Code of 1954. [2] Consequently petitioner contends that the proceeds realized by him during those years from sales of portions of the Dix Hills property at most constituted long-term capital gain. [3]
*262 Although resolution of the issue here presented involves essentially a factual determination, the courts in applying the above-mentioned sections of the Code have pointed out the most important factors to be taken into account in determining whether property at the time of sale was held primarily for sale to customers in the ordinary course of the taxpayer's business. The factors to be given the greatest weight in resolving such questions include the purpose of the taxpayer in acquiring the property; the period of time the property was held by the taxpayer; the purpose for which the property was held at the time of its sale; the extent of the improvements, if any, made to the property by the taxpayer; the frequency, continuity, and substantiality of sales; the nature of the taxpayer's business; and the extent of sales activity on the part of the seller or his agent in soliciting purchasers and in advertising the property. W. T. Thrift, Sr., 15 T.C. 366; Arthur E. Wood, 25 T.C. 468; Eline Realty Co., 35 T.C. 1; Kaltreider v. Commissioner, 255 F. 2d 833, *263 affirming 28 T.C. 121. From 1931 through the years in issue petitioner was engaged continuously as a stockbroker or in some phase of the securities business with the exception of a period of approximately 1 1/2 years during 1953 and 1954 when he served as vice president of Feldt Manufacturing Company of Dallas, Texas. He did not own any real estate apart from the Dix Hills property. He did not possess a real estate broker's license. During 1952 through 1954 he spent no more time in connection with the sale of the Dix Hills estate than was required to negotiate with brokers or to execute the necessary documents of sale. His sole connection with the disposition of real estate during the years here involved was his interest and activity in liquidating his 310-acre family estate primarily for the purpose of raising additional cash. Petitioner and his mother resided on the Dix Hills estate for approximately 24 years, or from 1927 until they rented the residence in the summer of 1951. Petitioner's purpose in the acquisition of title to the Dix Hills property in his own name was the prevention of the loss of the property through a distress sale on mortgage foreclosure. *264 It was his intention to continue to reside there until the property could be liquidated at a more favorable price. The Dix Hills property with its large acreage and luxurious residential facilities was not readily marketable either during the thirties or during the years in issue because of its high maintenance costs. No part of the Dix Hills property was disposed of prior to 1941 or until petitioner had held title in his own name for more than 3 years. In 1941 he sold three parcels of the estate (one consisting of 3 acres, one of 2 acres, and a 1-acre parcel) to a personal friend who had approached petitioner and asked to purchase those three parcels. Two additional parcels of the estate were sold during 1941, one of 5 acres and one of 15 acres, to persons who likewise sought out petitioner and inquired whether he would be willing to sell a part of the estate. These sales were made during 1941 primarily because of petitioner's need for additional cash. Further sales of the Dix Hills property were made during the years 1945 through 1951 without the aid of brokers to personal friends or to others who approached petitioner requesting to purchase certain parcels. These sales were *265 casual and sporadic and did not involve a substantial expenditure of time in sales activity. During the years 1951, 1952, and 1953 petitioner incurred substantial financial obligations which increased his need for further cash. In addition to the retention of the Dix Hills property with its burdensome maintenance costs, his mother, whom he had supported since his stepfather's death in 1933, became seriously ill and was hospitalized. He contributed substantially to the support of his three minor sons and made regular alimony payments to a former wife. During 1951 he sold certain securities at a substantial loss. Under these circumstances we are convinced that the sales made by petitioner of portions of the Dix Hills property during 1952, 1953, and 1954 were motivated by the necessity for raising additional funds with which to meet his urgent financial obligations. [4]
*266 At the beginning of 1952 petitioner held approximately 221 acres of the original 310-acre tract. Of the 221 acres he still held in 1952, 175 acres consisted of the 10-room stone residence, farmhouse, garage, swimming pool, tennis court, walled gardens, stables, barns, superintendent's cottage, etc., and the area immediately surrounding these improvements. This parcel of the tract was listed for sale by petitioner with a real estate broker during April 1952. The residence was rented during the summers of 1951 and 1952 to Charles Re. After Re had rented the residence during the summers of 1951 and 1952, he, together with his friend Edward Cantelmo, purchased the property on October 15, 1952, for $189,873.51. The sale was made without the intervention of a real estate broker. The sale of this property by petitioner to his summer tenant relieved him of the most expensive and burdensome portion of the maintenance costs involved in the ownership of the Dix Hills estate. This transaction represented a substantial step in the process of the liquidation by petitioner of his large family estate. Apart from the 175-acre residential portion sold to Re and Cantelmo during 1952, petitioner also *267 sold 7 1/2 additional acres of the Dix Hills property to seven different purchasers during that year with the assistance of a real estate broker. During 1953, 15 1/2 additional acres were sold to 10 purchasers. Nine of these transactions were completed through the assistance of brokers. Of the approximately 26 acres sold during the years 1952, 1953, and 1954, 23 acres were located on a portion of the Dix Hills tract which was unaccessible from public roads and was virtually landlocked. For the purpose of making these parcels of the estate marketable and in order to comply with the New York Town Law, petitioner during 1950 employed a surveyor to prepare a map of approximately 34 acres of interior land showing five parcels of property and streets laid out as designated by the local planning board of Huntington, New York. Petitioner filed this map with the County Clerk for Suffolk County on March 15, 1951. The parcels located in the mapped area constituted approximately 23 acres and sold for a total consideration of approximately $33,000. By comparison with the total sales of the Dix Hills tract such sales were not of substantial significance. In Estate of William D. Mundy, 36 T.C. 703, *268 we stated: the courts have also recognized that a taxpayer does not necessarily place himself in the real estate business by subdividing property he has inherited or held as an investment and selling it by lots in order to obtain a better price than it would attract if sold as one unimproved tract. * * * We are of the opinion that the above-stated principle is applicable to the situation here. Apart from the 175-acre tract containing the dwelling house, the approximately 24 acres sold during the years in issue were completely unimproved. Petitioner made no effort to develop these parcels in any way except for establishing bridle paths. The map prepared by a surveyor and filed with the Suffolk County Clerk in 1951 did not lay out uniform lots and streets as is usually done in subdivision planning. Petitioner has established that he had no intention of engaging in the real estate business during 1952, 1953, and 1954 or prior thereto; that the disposition of the Dix Hills estate in small parcels was the only practicable way to sell it; that his purpose in acquiring the property in 1938 *269 was to save it from falling into the hands of mortgage creditors at a distress price; that the sales of various parcels of the Dix Hills tract during the period 1941 through 1954 were sporadic and were motivated by the petitioner's need for liquidating the estate in order to raise needed cash with which to meet his personal obligations; and finally that the mere disposition of a large number of parcels of the family estate over a period of years was not sufficient to characterize petitioner's activities and his conduct of the sales transactions as a trade or business. The record discloses that the Dix Hills estate was held by petitioner at all times here material as a capital asset and that the parcels thereof which were sold by him during 1952, 1953, and 1954 were not at the time of sale held primarily for sale in the ordinary course of his trade or business and we so hold. Issue 2. Joint Venture Findings of Fact Although petitioner and his mother had agreed that in the event of the realization of profits from the liquidation of the Dix Hills estate they would divide the proceeds equally between them, they reached no agreement as to the sharing of possible losses resulting *270 from such disposition and they did not undertake to conduct the liquidation of the estate as a joint undertaking. Petitioner and his mother were coobligors on the $20,000 loan obtained from the Suffolk County Federal Savings and Loan Association early in March 1938. The loan was secured by a mortgage executed by Paul W. Havener individually on the Dix Hills property. This mortgage loan subsequently was satisfied on November 10, 1938, when petitioner received a $40,000 loan from Marine Midland Trust Company secured by a mortgage on the estate. Petitioner and Ann Mercer Koechl never maintained a joint set of books setting forth the income and expenses connected with the Dix Hills estate. Petitioner did not consult with his mother before disposing of the various parcels of the Dix Hills property sold during the years 1941 through 1954. She never requested an accounting from petitioner as to the expenses of maintaining the Dix Hills estate or the proceeds received from the various sales of parcels thereof. She did not engage in any sales activity during the years here in question or prior thereto. Petitioner and his mother maintained a joint bank account during the years 1941 through *271 1956. Neither petitioner nor his mother ever represented to the public that they were engaged in a joint undertaking. They filed partnership returns for 1955 and 1956 with tht district director for the Lower Manhattan District. Petitioner provided the financial support of his mother, using in part proceeds received from the sales of parcels of real estate located on the Dix Hills estate. An accounting of income and expenses connected with the Dix Hills property was prepared for petitioner by his accountant on December 1, 1955, and designated "Paul Havener and Ann Mercer Koechl Joint Venture Account for Period Through May 31, 1955." This document was prepared in connection with petitioner's income tax returns for 1955 and the following years. The above-mentioned accounting statement was delivered to petitioner's mother in December 1955. No other such accountings were ever prepared. Petitioner and his mother were not engaged in a joint venture in the ownership and disposition of the Dix Hills property. Subsequent to March 21, 1938, Ann Mercer Koechl retained no further interest in the property and made no further financial investment therein. On his income tax returns for 1952, *272 1953, and 1954, and on his "U.S. Partnership Return of Income" for 1955, petitioner reported the ownership and sale of the Dix Hills property as a joint venture arrangement with his mother, claiming a cost basis as to her in the amount of $158,200 in addition to his own investment therein. In his deficiency notices for 1952, 1953, and 1954, respondent determined that petitioner was the sole owner of the Dix Hills property. Following petitioner's acquisition of the estate on March 21, 1938, he remained at all times here material the sole owner and proprietor thereof. Opinion Petitioner claims that he and his mother, Ann Mercer Koechl, had established a joint venture relationship with respect to the ownership and disposition of the Dix Hills estate and that her basis in the property amounted to $158,200. If, as petitioner contends, a joint venture relationship in fact existed between petitioner and his mother throughout the years in issue, they are for tax purposes to be treated as partners under section 3797(a)(2) of the 1939 Code and sections 761(a) and 7701(a)(2) of the 1954 Code. *273 A joint venture is a combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. Tate v. Knox, 131 F. Supp. 514 (D.C.Minn., 1955); Estate of L. O. Koen, 14 T.C. 1406, 1409. Whether or not a joint venture relationship in fact exists depends essentially upon the intention of the parties. Donald P. Oak, 46 B.T.A. 265, 271. In order to support his contention that he and his mother created a joint venture with respect to the Dix Hills estate, it is incumbent upon petitioner to establish that: (1) there was a joining of property, skills, and risks in a common undertaking; (2) the parties possessed joint proprietorship and control over the assets and activities of the enterprise; and (3) they contracted to engage in a joint enterprise which involved at least a sharing of any resulting profits. Tate v. Knox, supra; sec. 301.7701-1(c), Proc. & Admin. Regs.; cf. Mitler v. Friedeberg, 222 N.Y.S. 2d 480. In support of his position that he *274 and his mother were joint venturers during the years in issue, petitioner points to their understanding concerning the possibility of recovering their investment in the Dix Hills property in case it should be liquidated and, in the event of the realization of a profit therefrom, the division of such profits equally between them. Petitioner described this agreement on cross-examination as follows: It was agreed between my mother and myself that I would take over the property, and, out of all the expenses that I had to incur to run the property, I would try to hang on to it to keep it from being sold, and I would recoup what it cost me and what it cost her, and then we would divide the proceeds. Ann Mercer Koechl confirmed this understanding, testifying on cross-examination as follows: Q. Did you ever have any agreement with your son with respect to sharing costs of selling the property? A. The only thing that we had between us was one thing. I told Paul, since he was going to take the thing over and try to do the best he could with it, and we tried to hang on and hang on and hang on, and I told him that any moneys that he spent on that place he should be reimbursed for. * * *275 * Q. Did you ever make any agreement with him that he would be reimbursed first for his cost from the profit? A. Yes, because he had children. Q. And that you would be reimbursed after that? A. That is right. Q. Were you ever reimbursed? A. Yes. Petitioner further points to the fact that when he borrowed $20,000 from the Suffolk County Federal Savings and Loan Association early in March 1938 (which loan was secured by a first mortgage on the Dix Hills property), Ann Mercer Koechl joined with her son as co-obligor on the loan. Petitioner used the proceeds of this loan, together with mortgage participation certificates which he had purchased in the face amount of $40,000, to acquire the Dix Hills property from the Mortgage Commission Realty Corporation on March 21, 1938. However, petitioner has been unable to demonstrate in what capacity his mother acted with respect to this loan. [5]
Ann Mercer Koechl may have been asked merely to co-sign a note as additional security *276 for the bank or it may have been that the bank was concerned about the possibility of her retaining some right of redemption in the property. Even though petitioner's mother appears to have extended her credit to facilitate the procurement by him of a $20,000 mortgage loan, this fact does not indicate that she personally contributed any capital to a joint venture with her son. The mortgage lien against the Dix Hills property served the bank as collateral for the loan. Petitioner alone held title to the estate following the foreclosure sale and he alone mortgaged it to the bank as security for the $20,000 loan. This loan was later satisfied in November 1938 when petitioner obtained an additional mortgage loan in the amount of $40,000 on the Dix Hills property from the Marine Midland Trust Company. Apart from a joint bank account which was maintained in the names of petitioner and his mother throughout the years 1941 through 1956, we are not able to find further evidence of the existence of a joint venture relationship. There is no indication that petitioner and his mother reached any understanding as to the sharing of possible losses which might be incurred as the result of the disposition *277 of the Dix Hills estate. It is clear that they did not maintain a joint set of books. Ann Mercer Koechl did not engage in any type of sales activity during the years here involved or prior thereto. Petitioner did not consult with his mother before selling any of the parcels of the estate. She did not request an accounting from petitioner concerning the various expenditures made in connection with the Dix Hills estate or the proceeds resulting from the disposition of various parcels thereof. No such accounting was made until December 1, 1955, when petitioner's accountant prepared such a statement for the purpose of assisting in the preparation of petitioner's income tax returns for 1955 and following years. There is no indication in the record that Ann Mercer Koechl had any control or supervision over petitioner's activities with respect to the Dix Hills property. Those with whom petitioner and his mother had dealings during the years in issue, as well as during prior years, such as the Marine Midland Trust Company, various real estate brokers, the surveyor employed by petitioner, and others, were unaware of any joint venture relationship between petitioner and his mother. We are *278 of the opinion that the understanding which was arrived at by petitioner and his mother concerning the possibility of recovering their investment in the Dix Hills estate and in the event of the realization of any profit therefrom the division of such profits equally is insufficient to establish the creation of a joint venture relationship. The total absence of any proof tending to show the existence of joint proprietorship and control of the Dix Hills property, together with the absence of any evidence indicating a contribution of property, money, time, or skill in such a purported common undertaking, is fatal to the petitioner's contention. If such a joint undertaking did in fact exist during the years in issue or during prior years, petitioner has not demonstrated the purpose of its creation apart from its convenience as a device for attempting to increase the tax basis of the Dix Hills estate. On the basis of the record presented, we hold that petitioner has failed to sustain his burden of establishing the existence of such a joint venture arrangement. Inasmuch as the foreclosure judgment, which was entered against the Dix Hills estate on December 9, 1937, followed by the conveyance *279 of title to petitioner on March 21, 1938, effectively terminated the interest of Ann Mercer Koechl in that property, she retained no further investment or basis therein which might have been contributed to such a joint undertaking as petitioner here claims existed. Further, petitioner has not demonstrated that his mother made any further investment in the Dix Hills estate following entry of the above-mentioned foreclosure judgment. Subsequent to March 21, 1938, petitioner was the sole owner and proprietor of the property. Issues 3 and 4. Basis of Property and Selling Expenses Findings of Fact As part of the petitioner's settlement with the Mortgage Commission of the State of New York, he paid interest in the amount of $6,000 to the holders of mortgage participation certificates during 1938. He paid attorneys' fees in the amount of $8,400.80 to Seth B. Robinson and Russell H. Robins for services rendered in connection with the acquisition of the Dix Hills property. He paid $11,386.26 in delinquent real estate taxes assessed against the Dix Hills estate by Suffolk County, New York, at the time he acquired the title thereto through foreclosure in 1938. Petitioner also paid delinquent *280 real estate taxes which had been assessed against the Dix Hills property by the Town of Huntington, New York, in the amount of $17,170.26 for local real estate tax years 1938 and 1939 to 1947 and 1948, inclusive. Each of the above-mentioned expenditures was made for the purpose of acquiring or improving the Dix Hills estate. Petitioner spent $6,000 for the construction and surfacing of roads on the Dix Hills property. He also spent $6,000 for the drilling of two new water wells on the property. During 1953 and 1954 petitioner paid real estate sales expenses in connection with the disposition of certain parcels of the Dix Hills estate as follows: Legal fee paid attorneys Weisner and
Meyer on December 1, 1954
$ 225.00
Legal fee paid attorney Sidney Pepper
on December 24, 1953
325.00
Legal fee paid attorney Merritt
Weidar on June 15, 1953
100.00
Cost of survey paid Frank Asbury on
March 20, 1953
500.00
Legal fee paid attorney Merritt
Weidar on March 10, 1953
50.00
Cost of survey paid Frank Asbury on
February 3, 1953
460.00
Total *
$6,706.50
*281 On his income tax returns for 1952 and 1953, petitioner claimed a total basis in the property of $249,036.97, consisting of $90,836.97 as his own investment and $158,200 as the basis of his mother, Ann Mercer Koechl. On his 1954 return, petitioner claimed a total basis of $250,022.77, consisting of $91,822.77 as his own investment and $158,200 as the basis of his mother. Petitioner further claimed selling expenses related to the sale of parcels of the Dix Hills estate property as follows: 1952
$17,880.75
1953
18,633.63
1954
18,633.63
In his deficiency notices for 1952, 1953, and 1954, the respondent determined that petitioner's total cost basis in the Dix Hills property amounted to $68,049.30, of which $34,450 was offset against the proceeds of sales occurring during years prior to 1952. Of the remaining basis ($33,599.30) allocated to sales during 1952 and subsequent years, the respondent determined the following apportionment: To residence and other
buildings
40.36%
$13,560.68
To 25 improved acres
around residence
21.82%
7,331.37
To other acreage, 200.84
acres
37.82%
12,707.25
100.00%
$33,599.30
The respondent further *282 determined that petitioner's selling expenses during 1952, 1953, and 1954 were as follows: 1952 $500
1953
225
1954
150
Petitioner's total investment in the Dix Hills property, together with his selling expenses connected with the disposition of certain parcels thereof, during 1952, 1953, and 1954 amounted to $121,730.64. *
Opinion The parties have stipulated that petitioner's investment in the Dix Hills property and his selling expense paid in connection with the sale of certain parcels of the estate during 1952, 1953, and 1954 amounted to not less than $82,283.54. * [6] At the trial, petitioner introduced evidence disclosing additional capital expenditures made for the purpose of acquiring and improving the Dix Hills estate as well as additional sales expenses made in connection with the sale of several parcels of the property during the years in issue. On the basis of the record presented we have found as a fact that he invested an additional $37,787.10 * in the property and paid additional selling costs amounting to *283 $1,660. * Petitioner's additional investment in the property in the amount of $37,787.10 * consisted of such expenditures as attorneys' fees paid for services rendered in connection with the acquisition of the Dix Hills estate, the cost of constructing roads on the property, the cost of drilling two water wells, the payment of delinquent real estate taxes totaling $28,556.52, interest paid to mortgage participation holders at the time of acquisition in 1938, etc. These expenditures may be added to his cost basis in the property. Sec. 113(a)(13), I.R.C. 1939; secs. 266 and 1012, I.R.C. 1954; Joell Co., 41 B.T.A. 825; W. D. Haden Co. v. Commissioner, 165 F. 2d 588; sec. 1.263(a)-2(a), Income Tax Regs.; cf. Mt. Morris Drive-In Theatre Co., 25 T.C. 272, affd. per curiam 238 F. 2d 85. The items comprising additional sales expenses made by petitioner in the *284 amount of $1,660 *, [8] consisting of legal fees and surveyor's fees, all of which were made in connection with the sale of certain parcels of the Dix Hills tract, may be deducted from the consideration received upon the disposition of the parcels sold. Mrs. E. A. Giffin, 19 B.T.A. 1243. The above-stated amounts when added to the stipulated cost and sales expense figure of $82,283.54 * produce a total of $121,730.64. * Petitioner contends that he and his mother, as joint venturers, are entitled to first recover entirely their claimed basis in the Dix Hills estate before reporting any part of the proceeds resulting from the sales of the various parcels disposed of during the years in issue. We have held under Issue 2, supra, that *285 petitioner's mother was not a joint venturer with him in his liquidation of the property, and that he was its sole owner. Petitioner has cited no authority in support of his position that he is entitled to a complete recovery of cost before reporting gain and we have found none. He has not claimed that the property in question was insusceptible of valuation or that the rationale of Burnet v. Logan, 283 U.S. 404, is here applicable. It is well established that, where a tract of land is acquired as a unit for a lump sum consideration and is subsequently sold in parcels, the total cost must be allocated among the parcels and a basis for each lot sold thereby determined. Cleveland-Sandusky Brewing Corp., 30 T.C. 539; Leake v. Commissioner, 140 F. 2d 451, certiorari denied 323 U.S. 722; sec. 39.22(a)-(11), Regs. 118. Only where a fair apportionment of the total cost is impossible may the recognizable gain be postponed until all the proceeds from the sale of the separate units exceed the total basis. Webster Atwell, 17 T.C. 1374. *286 Petitioner has not attempted to show that such is the case here or that the respondent erred in his apportionment of petitioner's total basis to pre-1952 years and to the various parcels sold. The record in fact demonstrates to the contrary. The respondent's allocation of petitioner's basis in the Dix Hills property is therefore sustained. Issue 5. Unreimbursed Business and Travel Expenses Findings of Fact Petitioner was employed by the Feldt Manufacturing Company of Dallas, Texas, during 1953 and until May 31, 1954. Throughout that period he was employed as an outside salesman and was required to use his automobile in connection with his work, traveling through Texas, Arizona, Louisiana, Mississippi, Alabama, Florida, and other states on behalf of his employer. During 1953 he received reimbursement for travel expenses in the amount of $3,792.24 from the Feldt Manufacturing Company. During 1954 petitioner received reimbursement for travel expenses in the amount of $250 and reimbursement for automobile payments in the amount of $974.88. On his income tax returns for 1952, 1953, and 1954, petitioner claimed deductions for unreimbursed business and travel expenses in the amounts *287 of $2,916.65, $2,256.00, and $4,411.25, respectively. In his deficiency notices for 1953 and 1954, the respondent determined that petitioner received reimbursement from his employer for travel and automobile expenses in the amounts of $5,412.20 and $1,108.78, respectively. The respondent disallowed these deductions to the extent of $1,416.65 for 1952, $8,868.20 for 1953, and $1,408.77 for 1954. Opinion The parties have stipulated that during 1953 petitioner received reimbursement from his employer for travel expenses in the amount of $3,792.24 and that during 1954 he received reimbursement for travel expenses in the amount of $250 and for automobile expenses in the amount of $974.88. No additional proof relating to such expenses was offered at the trial and petitioner on brief makes no contention that the respondent's determination was erroneous except for adjustments thereto for 1953 and 1954 resulting from the above-stated stipulation concerning reimbursement received during those years. Consequently, except for such adjustments, the respondent's determination must be sustained. Issue 6. Business Expenses Findings of Fact On his income tax return for 1956 petitioner *288 claimed a deduction in the amount of $1,200 for "Investment services, Periodicals, Telephone, and Other Expenses in connection with production of investment income, and unreimbursed business expenses as President of Havener-Hall Securities Corp." In his deficiency notice for 1956 the respondent disallowed the deduction in full. Petitioner made unreimbursed business expenditures during 1956 in the amount of $600. Opinion Petitioner testified at the trial that he made business expenditures in the amount of $1,200 during 1956 on behalf of Havener-Hall Securities Corporation for which he received no reimbursement. However, petitioner failed to explain the specific nature of these expenses and has not attempted to introduce further evidence in support thereof. Consequently in view of the inexact state of the record we have found as a fact that petitioner made unreimbursed business expenditures during 1956 in the amount of $600. He is accordingly entitled to deduct this amount as a business expense for 1956. Issue 7. Dependency Credit Findings of Fact During 1954, 1955, and 1956, petitioner's son George lived with his mother when he was not away from his home attending the *289 Hill School or attending a boys' camp during the summer months. Petitioner paid the full cost of George's tuition, room, and board at the Hill School for a full school year during 1954, 1955, and 1956 as well as the entire cost of his attendance at a summer camp during each of those years. On his income tax returns for 1954, 1955, and 1956 petitioner claimed a dependency credit for his son George. The respondent disallowed the exemptions claimed by petitioner for his son George for each of the years 1954, 1955, and 1956. Opinion The record does not indicate the total cost of the support of petitioner's son George during 1954, 1955, or 1956. Nor has petitioner established the actual or approximate amount of his expenditures for the support of his son during any of those years. Consequently, although petitioner testified at the trial that he spent $200 per month during each of the years in issue for the cost of his son's tuition, room, and board at the Hill School and in addition that he paid the entire cost of George's attendance at a summer camp during 1954, 1955, and 1956, he nevertheless has failed to show clearly that he contributed more than one-half the cost of his son's *290 support during any of those years. The respondent's determination must therefore be sustained. Issue 8. Self-Employment Tax Opinion In his notice of deficiencies for 1952 and 1956, respondent has determined that petitioner is liable for the tax on self-employment income under section 481 of the 1939 Code and sections 1401 and 1402 of the 1954 Code. The respondent concedes on brief that the question whether petitioner is liable for such self-employment taxes depends for its resolution upon the question involved in Issue 1, supra, viz., whether during the years involved petitioner held the Dix Hills property primarily for sale to customers in the ordinary course of his trade or business. Inasmuch as we have held under Issue 1, supra, that the Dix Hills estate was not held by petitioner for sale to customers in the ordinary course of his trade or business, petitioner did not realize "gross income derived * * * from any trade or business carried on by such individual" within the meaning of section 481(a) of the 1939 Code and section 1402(a) of the 1954 Code. We accordingly hold that petitioner is not liable for the self-employment tax imposed under those sections for either 1952 *291 or 1956. Issue 9. Addition to Tax for Failure to File Timely Returns Findings of Fact During 1953 petitioner requested the director for the Lower Manhattan District, New York, New York, to grant an extension of time for filing his individual income tax return for 1952. The director granted petitioner an extension of time requiring him to file his 1952 return on or before September 15, 1953. On December 23, 1953, petitioner signed an affidavit, attested by a notary, containing a summary of reasons for his failure to file his 1952 return by September 15, 1953. On December 30, 1953, petitioner filed his return for 1952 with the director for the Lower Manhattan District. The affidavit signed by petitioner on December 23, 1953, was attached to his 1952 return as filed. In his deficiency notice for 1952, the respondent determined that petitioner is liable for a delinquency penalty under section 291(a) of the 1939 Code. Petitioner's failure to file his 1952 return on or before September 15, 1953, was not due to reasonable cause. Opinion Petitioner offered no evidence at the trial that his failure to file a timely income tax return for 1952 was due to "reasonable cause" *292 within the meaning of section 291(a) of the 1939 Code. The respondent granted petitioner an extension of time until September 15, 1953, within which to file his 1952 return. No further extension of time for such filing was requested by petitioner or was granted by respondent. Petitioner apparently made no effort to apprise the respondent of his reasons for further delaying the filing of his return until December 30, 1953, when he filed an affidavit reciting his reasons for such delay together with his 1952 return. Under these circumstances we conclude that petitioner's failure to file a timely return for 1952 was not shown to be due to reasonable cause under section 291(a). Consequently the respondent's determination of an addition to tax for failure to file a timely return under that section is sustained. Issue 10. Addition to Tax for Negligence Opinion In his deficiency notice for 1953, the respondent determined that petitioner is liable for an addition to tax for negligence under section 293(a) of the 1939 Code. Petitioner offered no proof at the trial with respect to this penalty and has failed to mention it on brief. We accordingly must leave the parties where we *293 find them and the respondent's determination is sustained. Issue 11. Addition to Tax for Failure to File a Declaration of Estimated Tax Findings of Fact Petitioner received investment income in the amount of $657.36 during 1952 and he received such income in the amount of $5,829.93 during 1953. He did not file a declaration of estimated tax for either 1952 or 1953. In his notice of deficiencies for 1952 and 1953, the respondent determined that petitioner is liable for an addition to tax for failure to file a declaration of tax for either year. Opinion On brief, the respondent concedes that the amount of the penalty for which petitioner is liable under section 294(d)(1)(A) of the 1939 Code depends in part upon our decision under Issues 1, 2, and 3, supra. The respondent contends nevertheless that, in view of petitioner's failure to file a declaration of estimated tax for 1952 or 1953 when he in fact received investment income during those years in the amount of $657.36 and $5,829.93, respectively, the determination that the penalty applies should be sustained. Petitioner has offered no proof with respect to this issue and has failed to mention it on brief. We therefore *294 leave the parties where we find them and the respondent's determination is sustained. Issue 12. Addition to Tax for Underpayment of Estimated Tax Opinion In his deficiency notice for 1956 the respondent determined that petitioner is liable for an addition to tax for underpayment of tax under section 6654 of the 1954 Code. Inasmuch as petitioner has offered no proof with respect to this issue and has failed to discuss it on brief, we sustain the respondent's determination. Decisions will be entered under Rule 50. Footnotes
1. I.R.C. 1939. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxpayer year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * ↩
2. I.R.C. 1954. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
3. However, as we have more fully set forth in our Opinion under Issues 3 and 4, infra, petitioner's first contention is that he is entitled to recover his entire investment in the estate before reporting gain from the sales of the parcels in question.↩
4. Petitioner's mother explained the reason for the sales of the Dix Hills property on cross-examination as follows: Q. Were you ever asked if you approved of a particular sale? A. No, because at that particular time that he was selling pleces of the land, land wasn't going for so very much at that time and money was very hard to come by; and whatever he got for the land, that is what he took. * * *
Q. Did you ever devote any time or activity to selling this property yourself? A. Never. We never thought of the price about anything, sir, except that when we were so terribly heavily indebted and couldn't see our way out, so then we sold a piece of property if we could. [Tr. 46-A, 47.]↩
5. The records of the Suffolk County Federal Savings and Loan Association pertaining to this $20,000 loan made to petitioner and his mother in 1938 were shown to have been destroyed prior to trial.↩
*. Reference to a realtor's commission of $5,046.50 was omitted from this listing by order of the Tax Court dated 7/13/64 and signed by Judge Withey↩.
*. By official order of the Tax Court these figures were substituted for those which appeared in the decision as originally released.↩
6. The various cost items and selling expenses claimed by petitioner on his income tax returns for the years in issue and the amounts thereof agreed to by the respondent are set forth in detail in Joint Exhibit 23-W.↩
8. At the trial petitioner introduced in evidence a canceled check issued to "McNutt & Nash" in the amount of $235.71 on August 24, 1953. Since petitioner's purpose in making this payment and the nature thereof are not disclosed by the record, this amount of the claimed selling expenses is disallowed. a1 By official order of the Tax Court these figures were substituted for those which appeared in the decision as originally released.↩